[No. 18271. Department One. February 6, 1924.]

THE STATE OF WASHINGTON, *Respondent*, v. OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY, *Appellant*.[1]

COMMERCE (1, 10)—POWERS TO REGULATE REMAINING IN STATE—PROHIBITORY ACTS—QUARANTINE OF GOODS—STATUTES—VALIDITY. It is not an unreasonable interference with interstate commerce for the director of agriculture, pursuant to Rem. Comp. Stat., § 2780 *et seq.*, to exclude at the state line, without inspection, all shipments of alfalfa (which is a relatively large resource of the state) originating from certain territory outside of the state which he has duly and in good faith found so afflicted with weevil that its admission would probably result in material injury by infection to considerable property in the state; and his findings to that effect are *prima facie* sufficient to support the quarantine.

AGRICULTURE (3)—QUARANTINE AGAINST PLANT INFECTION—POWERS OF STATE—STATUTES. In the absence of Federal quarantine regulations with reference to alfalfa weevil, pursuant to U. S. Comp. Stat., § 8760, as amended, authorizing the Secretary of Agriculture to quarantine any state to prevent the spread of plant disease, such act does not preclude the state's quarantine against alfalfa weevil from an infected district outside the state, pursuant to Rem. Comp. Stat., § 2780 *et seq.*, which is not in such case superseded by the Federal act.

SAME (3). Under the quarantine act, as a whole, and Rem. Comp. Stat., § 2781, thereof, authorizing such obligatory quarantine

[1]Reported in 223 Pac. 600.

regulations as may be necessary to prevent plant contagion, the director of agriculture may exclude at the state line, without inspection, all shipments of alfalfa from certain infected territory outside the state.

SAME (3). A quarantine order by the director of agriculture against shipments of alfalfa from an infected territory outside the state is valid without formal proclamation by the governor, as provided in Rem. Comp. Stat., § 2782, where it was filed in the secretary of state's office as provided by § 2781, approved by the governor, and actual notice given to railroads entering the state.  ` · ,

COMMERCE (1, 10)—POWER TO REGULATE—QUARANTINE—REASONABLENESS. Such an order, excluding all shipments of alfalfa from weevil infected territory without inspection, unless contained in sealed containers, is not an unreasonable interference with interstate commerce, in view of the impracticability of inspecting shipments and the danger to the crop in the state.

SAME (1, 10). In such a case, the shipment of alfalfa in open cars through the state, not in sealed containers, must, under the evidence, be considered in effect a shipment into the state.

Appeal from a judgment of the superior court for Thurston county, Wilson, J., entered July 13, 1923, upon findings in favor of the plaintiff, in an action for an injunction, tried to the court. Affirmed.

*Bogle, Merritt & Bogle* and *E. I. Jones* (*R. A. Jordan*, of counsel), for appellant.

*The Attorney General* and *R. G. Sharpe*, Assistant, for respondent.

PARKER, J.—The state, by its *Attorney General*, commenced this action in the superior court for Thurston county, seeking an injunction forbidding the defendant Railroad & Navigation Company from shipping into the state, or through the state except in sealed containers, any alfalfa hay from certain territory of neighboring states, in violation of a quarantine order, issued and promulgated by the state director of agriculture with the approval of the governor. The defendant demurred to the complaint, which demurrer

was by the trial court overruled. The defendant thereupon answered, controverting certain of the facts alleged in the complaint and also pleading affirmative defenses which, for the most part, contain claims of right under Federal constitutional and statutory provisions relating to interstate commerce, which had been claimed upon the presentation of the demurrer. Thereafter a trial was had resulting in a decree awarding to the state injunctive relief as prayed for, from which the defendant has appealed to this court.

As we view the controversy, some of the principal contentions here made in appellant's behalf are finally determinable by a consideration of questions arising upon the demurrer to the complaint. This calls for a somewhat extended setting forth of the allegations of the complaint, the quarantine order made a part thereof, and the provisions of Chapter 105 of the Laws of 1921, in pursuance of which the order was issued. The allegations of the complaint and prayer are as follows:

"That during all the times herein mentioned the defendant was and now is a corporation, duly organized and existing under and by virtue of the laws of the state of Oregon, and engaged in maintaining and operating lines of railroad in the states of Idaho, Oregon and Washington, and in Thurston County, Washington, as a public carrier for hire.

"That at all times since June, 1921, and prior thereto, there has existed and now exists in the areas of the states of Utah, Idaho, Wyoming, Oregon and Nevada, hereinafter set forth, an injurious insect popularly called the alfalfa weevil, and scientifically known as the Phytonomus posticus, which said insect feeds upon the leaves and foliage of the alfalfa plant, as a result of which crops of alfalfa are, where such insects exist in large numbers, greatly damaged or totally destroyed; that said insect multiplies rapidly and is propagated by means of eggs deposited by the female

insect upon the leaves and stalks of the alfalfa plant; that when the alfalfa plant is cured, the eggs cling to and remain dormant upon the cured alfalfa hay and even in the alfalfa meal, when such hay is converted into meal, and such eggs and live weevils are likely to be carried to any point where such alfalfa hay is transported, such eggs there to germinate and the alfalfa weevil there to be distributed and propagated, and that as a result thereof, the curing of alfalfa hay infected with the said alfalfa weevil, and the transporting of such hay and the meal made therefrom to localities theretofore free from such weevil, may, and commonly does, result in the infection with said weevil of the alfalfa crops at the points to which such alfalfa hay and meal is transported. That when said alfalfa hay and meal produced from crops of alfalfa infected with the alfalfa weevil is transported in common box cars such as are commonly used upon the several railroads in the state of Washington, including defendant, and not placed in sealed containers, said meal and the hay and the dried leaves and foliage therefrom containing said eggs and live weevils is likely to be shaken out and distributed along the route taken by the freight cars in which the same is conveyed and said pest communicated to the agricultural lands adjacent to the said route as a result of the germination of the eggs of the alfalfa weevil upon the hay falling from such freight cars and the falling out of said live weevils. That a proper inspection to ascertain the presence of such weevil eggs in carloads of alfalfa hay or meal would require that every bale of hay and sack of meal contained in such carload or consignment be torn open and a careful inspection made of the stalks and leaves of such alfalfa, and such meal, which method of inspection is necessarily prohibitive in cost and wholly impracticable, and that hence the only practical method of preventing the spreading of the said alfalfa weevil pest into uninfested districts is to prohibit the transportation of alfalfa hay or meal from the districts in which the said alfalfa weevil exists. That said alfalfa weevil is new to and not generally distributed within the state of

Washington. That there is no known method of ridding a district infected with such alfalfa weevil of such pest and that when a district is once infested therewith it always remains thus infested.

"That subsequent to June 8, 1921, and prior to September 17, 1921, information was received by the Director of Agriculture of the State of Washington that there was a probability of the introduction of such alfalfa weevil into the state of Washington and across the boundaries thereof, and the said Director of Agriculture did thereupon proceed thoroughly to investigate said insect and the areas where such pest existed, and from such investigation, did ascertain that such pest existed and was dangerously injurious to alfalfa in the whole of the state of Utah, all portions of the state of Idaho lying south of Idaho county, the counties of Unida and Lincoln in the state of Wyoming, the county of Delta in the state of Colorado, the counties of Malheur and Baker in the state of Oregon, and the county of Washoe in the state of Nevada, and that the said Director of Agriculture of the state of Washington did thereupon, on or about September 17, 1921, make and promulgate a quarantine regulation and order under the terms of which the said Director of Agriculture did declare and proclaim a quarantine against all of the above described areas and forbid the importation into the State of Washington of alfalfa hay and alfalfa meal (except under the conditions therein contained), and that the said Director of Agriculture did thereupon at once notify the Governor of the State of Washington of such quarantine limits established as aforesaid, and the said Governor of the State of Washington did thereupon approve the same and did thereupon issue his proclamation proclaiming the boundaries of such quarantine as fixed in said order and the nature thereof and the order, rules and regulations prescribed for the maintenance and enforcement thereof, and did thereupon duly publish said proclamation by causing the same to be filed in the office of the secretary of state of the state of Washington, and by causing copies thereof to be transmitted to each of the railroad companies doing business in the state of

Washington, and by causing a summary thereof to be published in various newspapers published in the state of Washington, such publication being deemed sufficient and expedient to give proper notice of such quarantine order, and that at all times since said September 17, 1921, said quarantine order and regulation has been and now is in full force and effect, and at all times since September 17, 1921, the defendant has had actual notice of such quarantine order and regulation. That a true copy of said quarantine order is hereby attached, marked 'Exhibit A', and made a part hereof.

"That during the months of January, February, March and April, 1923, the defendant, well knowing of the existence and promulgation of said quarantine order hereinabove described, and in total disregard and violation thereof, caused to be shipped into the state of Washington in common box cars and not in sealed containers, a large number, to-wit, approximately one hundred car loads of alfalfa hay, all of which said alfalfa hay was consigned and shipped, with the knowledge of the defendant, from various points in the state of Idaho lying south of Idaho county in said state of Idaho, and through the state of Oregon and into the state of Washington in direct violation of said quarantine order hereinabove set forth, and that unless the defendant is enjoined and restrained from so doing, said defendant will continue so to ship alfalfa hay from such quarantined area of the state of Idaho into and through the state of Washington.

"That large quantities of alfalfa are grown and produced in the eastern and central portions of the state of Washington and adjacent to the railroad lines of defendant and particularly the lines of the defendant and the other railroads in the state of Washington over which such shipments of alfalfa hay were shipped and are likely to be shipped in the future, unless an injunction is issued as prayed for in this complaint, and that unless said defendant is enjoined and restrained from continuing to ship such alfalfa hay into the state of Washington from such quarantined areas, the districts where alfalfa is grown in the state of

Washington is likely to and will become infested with such alfalfa weevil pest to the great and irreparable damage of the citizens and residents of the state of Washington engaged in growing and producing alfalfa therein.

"That neither the plaintiff, nor the citizens of the state of Washington engaged in the growing and production of alfalfa have any plain, speedy or adequate remedy at law.

"Wherefore, Plaintiff prays for judgment against the defendant perpetually restraining and forbidding the defendant, its agents, officers or employees, or any of them, from transporting into the state of Washington (or through said state except in sealed containers) any alfalfa hay or any other products forbidden to be imported into the state of Washington by said quarantine order from the areas covered and described in said quarantine order."

The quarantine order made part of the complaint, in so far as we need here notice its terms, reads as follows:

"Quarantine Order No. 4.

"Pertaining to the Alfalfa Weevil.

"Whereas, It has become known to me that an injurious insect, popularly called the alfalfa weevil, and scientifically known as 'Phytonomus posticus,' exists and is dangerously injurious to alfalfa in the State of Utah, and in many of the counties in the southern part of Idaho, and in certain counties in the state of Wyoming, to-wit; Unida and Lincoln; and in a certain county in the State of Colorado, to-wit: Delta; and in certain counties in the State of Oregon, to-wit: Malheur and Baker; and in Washoe County, Nevada.

"Now Therefore, I, E. L. French, Director of Agriculture of the State of Washington, under and by virtue of the authority conferred upon me by Chapter 105, Session Laws of 1921, do hereby declare and proclaim a quarantine against said state of Utah, and all portions of the State of Idaho lying south of Idaho County, and the counties of Unida and Lincoln in the State of Wyoming; and the county of Delta in

the State of Colorado and the counties of Malheur and Baker in the State of Oregon, and the County of Washoe in the State of Nevada, and forbid the importation into Washington of the following agricultural products and other articles, excepting under conditions and regulations as specified.

"1. Alfalfa hay . . ."

Some other provisions are contained in the order, but, for present purposes, we are concerned with the order only as an absolute exclusion of alfalfa hay from the state, the shipments of which originate in any of the territory against which the quarantine order runs. The quarantine order is silent on the question of shipments of hay through the state, originating in the territory specified in the order, but the state is not seeking to enjoin shipments passing through the state if they be placed in sealed containers; the theory of counsel for the state, as we understand them, being that hay passing through the state other than in sealed containers shall be regarded as being shipped into the state. The provisions of ch. 105, Laws of 1921, p. 308 [Rem. Comp. Stat., § 2780], which seem necessary to be noticed, read as follows:

"Section 1. The forest, agricultural, horticultural, ornamental and floral trees, shrubs, and plants in the state of Washington, and the products thereof shall be preserved and protected from the ravages of diseases, insects, and animal and weed pests injurious thereto and destructive thereof. [Rem. Comp. Stat., § 2780.]

"Sec. 2. The Director of Agriculture shall have the power and it shall be his duty by and with the approval of the Governor to establish and the director shall thereupon maintain and enforce such obligatory quarantine regulations as may be deemed necessary to protect the forest, agricultural, horticultural, ornamental and floral trees, shrubs and plants, and the products thereof in the state of Washington, against

contagion or infestation by injurious plant disease insects, or animal or weed pests, by establishing such quarantine at the boundaries of this state or elsewhere within the state, and he may make and enforce, any and all such obligatory rules and regulations as may be deemed necessary to prevent any infected or infested forest, agricultural, horticultural, ornamental and floral trees, shrubs, and plants, and the products thereof in the state of Washington from passing over any quarantine line established and proclaimed pursuant to this act, and all such articles shall, during the maintenance of such quarantine, be inspected by such director or by horticultural or other inspectors thereto appointed, and he and the inspectors so conducting such inspection shall not permit any such article to pass over such quarantine line during such quarantine, except upon a certificate of inspection, signed by such director or in his name by such inspector who has made such inspection. All approvals by the governor given or made pursuant to this act shall be in writing and signed by the governor in duplicate, and one copy thereof shall be filed in the office of the secretary of state and the other in the office of said director before such approval shall take effect. [Rem. Comp. Stat., § 2781.]

"Sec. 3. Upon information received by such director of the existence of any infectious plant disease, insect or other animal or weed pest, new to or not generally distributed within this state, dangerous to any plant or commodity or to the interests of the plant industry of this state, or that there is a probability of the introduction of any such infectious plant disease, insect or other animal or weed pests into this state or across the boundaries thereof, he shall proceed to thoroughly investigate same and may establish, maintain and enforce quarantine as hereinbefore provided, and may make and enforce such regulations as are in his opinion, necessary to circumscribe and exterminate such infectious plant diseases, insect or other animal or weed pests and prevent the spread thereof. Such director may disinfect, or take such other action with reference to any trees, shrubs, plants, vines, cuttings,

grafts, scions, buds, fruit-pits, fruit, seeds, vegetables or any crops or crop products, and any containers thereof, and any packing material used therewith infested or infected with, or which, in his opinion may have been exposed to infection or infestation by, any such infectious plant diseases, insect or other animal or weed pests, as in his discretion shall seem necessary to carry out and give effect to the provisions of this act. Such director, his deputies and inspectors are hereby authorized to enter upon any ground or premises to inspect the same or to inspect any tree, shrub, plant, vine, cutting, graft, scion, bud, fruit-pit, fruit, seed, vegetable or other article of horticulture or implement thereof or box or package or packing material pertaining thereto, or connected therewith or that has been used in packing, shipping or handling the same, and to open any such package, and generally to do, with the least injury possible under the conditions to property or business all acts and things necessary to carry out the provisions of this act. The said director shall at once notify the Governor of all quarantine lines established under or pursuant to this act, and if the Governor approve or shall have approved of the same or any portion thereof, the same shall be in effect and the Governor may issue his proclamation proclaiming the boundaries of such quarantine and the nature thereof, and the order, rules or regulations prescribed for the maintenance and enforcement of the same, and may publish said proclamation in such manner as he may deem expedient to give proper notice thereof. . . . [Rem. Comp. Stat., § 2782.]

"Sec. 5. When any shipment of . . . agricultural product passing through any portion of the State of Washington in transit, is infested or infected with any species of injurious insects, their eggs, larvae, pupae or animal or plant disease, which would cause damage, or be liable to cause damage to the forests, orchards, vineyards, gardens, or farms of the State of Washington, or which would be, or liable to be, detrimental thereto or to any portion of said state, or to any of the forests, orchards, vineyards, gardens or farms

within said state, and there exists danger of dissemination of such insects or disease while such shipment is in transit in the State of Washington, then such shipment shall be placed within sealed containers, composed of metallic or other material, so that the same can not be broken or opened, or be liable to be broken, or opened, so as to permit any of the said shipment, insects, their eggs, larvae, or pupae or animal or plant disease to escape from such sealed containers and the said containers shall not be opened while within the State of Washington. [Rem. Comp. Stat., § 2784.]

''Sec. 6.    Whenever the director of agriculture declares, promulgates and issues quarantine measures, orders or regulations against any part or portion of this state or any other state or country or section thereof, for the protection of any forest, agricultural, horticultural, ornamental or floral trees, shrubs or plants, and there shall be received in this state, any forest, agricultural, horticultural, ornamental or floral trees, shrubs, or plants, or the raw products thereof, from any part or portion of this state or any other state or country or section thereof, against which the quarantine has been issued as to such commodity, it shall be the duty of the person, or the official of the carrier having such shipment in charge for delivery, unless the same is accompanied by a certificate of inspection and approval by a horticultural inspector of this state, showing that the same was inspected and approved at the initial point of shipment, to notify the horticultural inspector stationed nearest to the point where said shipment is received, of the receipt of such shipment giving the name of the consignor and consignee and stating that such shipment is ready for inspection and delivery.    Said notification shall be either by telephone or telegraph, and confirmed by written notice delivered personally to said inspector or to some person of suitable age and discretion at his residence or office, or by mail addressed to said inspector at his place of residence or at his office; and it shall be unlawful for any such agent or person having such shipment in charge to deliver the same to the consignee or to any other person until the same

shall have been inspected by a horticultural inspector: Provided, however, That such agent shall not be required to hold such shipment more than forty-eight hours after notifying the inspector as aforesaid, except in case the notice is given by mail, in which event, such shipment shall be held for such period beyond said forty-eight hours as is ordinarily required for delivery of mail to the address of the inspector.'' [Rem. Comp. Stat., § 2785.]

Other provisions of the law relate to penalties of a criminal nature for its violation. We may observe, in this connection, however, that no contention is here made, and apparently was not made to the trial court, that injunction is not a proper available remedy to the state as against the defendant. This brings us to the consideration of the questions here raised and finally determinable upon the demurrer to the complaint.

It is contended in behalf of appellant that the quarantine order is in violation of § 8, of art. I, of the constitution of the United States, in so far as that section gives to Congress power ''to regulate commerce . . . among the several states . . .'' The argument seems to be that, because the quarantine order is in terms an absolute prohibition against the bringing into the state of any alfalfa hay from the territory against which the quarantine order runs, it is in effect an unreasonable and unwarranted interference with interstate commerce, conceding that the state may establish reasonable regulations looking to the inspection at the state line of commodities about to enter the state with a view of excluding such as shall be found to be infected in such manner as to endanger persons and property in the state; in other words, that the state does not possess the power to determine that certain territory outside the state is so afflicted with alfalfa weevil that no alfalfa hay coming from

such territory can be safely allowed to come into the state because of the probability of our own alfalfa crops becoming infected in the same manner and thereby seriously damaged.

Counsel for appellant place their principal reliance upon the decision of the supreme court of the United States in *Railroad Co. v. Husen*, 95 U. S. 465, and subsequent decisions of that court of the same import. In that case, there was drawn in question a statute of the state of Missouri prohibiting the bringing into that state of certain kinds of cattle, as follows:

"No Texas, Mexican, or Indian cattle shall be driven or otherwise conveyed into or remain in any county in this State, between the first day of March and the first day of November in each year, by any person or persons whatsoever."

That statute contained certain other provisions, but it did not pretend to define any outside territory quarantined against; nor did it pretend to differentiate between cattle afflicted with contagious or infectious diseases and cattle that were not so afflicted. All cattle of the kind specified were indiscriminately excluded. Holding that this Missouri statute was void as an attempted interference with interstate commerce, Mr. Justice Strong, speaking for the court, said:

"Many acts of a State may, indeed, affect commerce, without amounting to a regulation of it, in the constitutional sense of the term. And it is sometimes difficult to define the distinction between that which merely affects or influences and that which regulates or furnishes a rule for conduct. There is no such difficulty in the present case. While we unhesitatingly admit that a State may pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, &c., from entering the State;

while for the purpose of self-protection it may establish quarantine, and reasonable inspection laws, it may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or inter-state commerce. . . .

"Tried by this rule, the statute of Missouri is a plain intrusion upon the exclusive domain of Congress. It is not a quarantine law. It is not an inspection law. It says to all natural persons and to all transportation companies, 'You shall not bring into the State any Texas cattle or any Mexican cattle or Indian cattle, between March 1 and Dec. 1 in any year, no matter whether they are free from disease or not, no matter whether they may do an injury to the inhabitants of the State or not; and if you do bring them in, even for the purpose of carrying them through the State without unloading them, you shall be subject to extraordinary liabilities.' Such a statute, we do not doubt, it is beyond the power of a State to enact. To hold otherwise would be to ignore one of the leading objects which the Constitution of the United States was designed to secure."

The later decision of the supreme court of the United States in *Schollenberger v. Commonwealth of Pennsylvania*, 171 U. S. 1, and *Paul v. Commonwealth of Pennsylvania*, 171 U. S. 1, the famous oleomargarine cases, is also relied upon by counsel for appellant. The statute of Pennsylvania there drawn in question purported to prohibit shipment into the state of Pennsylvania of oleomargarine, manifestly for no other reason than that it was oleomargarine, and that its coming into the state would, in some manner not made clearly apparent, be detrimental to the state. The supreme court of the United States, upon a writ of error from the supreme court of Pennsylvania, held that oleomargarine could not be so arbitrarily excluded from shipment into Pennsylvania, it being a lawful

subject of interstate commerce in such shipment, and the court being able to take judicial notice of the fact that, as an article of food, it was not detrimental to health, though recognizing that the state might, by inspection regulations, see that it came into the state only in a pure and wholesome condition. These decisions, and others of the same import relied upon by counsel for appellant, we think, deal with a problem quite different from the one before us.

Here we have our state authorities acting in pursuance of a law of the state, making and promulgating a quarantine order prohibiting an agricultural product from coming into the state, solely because of the danger of a like agricultural product produced in our state becoming infected therefrom and resulting in the probable ultimate destruction of that product as a resource of our state. In *Rasmussen v. Idaho,* 181 U. S. 198, there was drawn in question a statute of that state and a proclamation of the Governor issued in pursuance thereof, which proclamation read as follows:

"Whereas, I have received statements from reliable wool growers and stock raisers of the State of Idaho, said statements being supplemented by affidavits of reputable persons, all to the effect that the disease known as scab or scabbies is epidemic among sheep in certain localities or districts, viz., in the county of Cache, State of Utah; the county of Box Elder, in the State of Utah; and the county of Elko, in the State of Nevada; and,

"Whereas, it is known that sheep from said districts are annually moved, driven or imported into the State of Idaho, and if so moved would thereby spread infection and disease on the ranges and among the sheep of this State, which act would result in great disaster:

"Now, therefore, I, Frank Steunenberg, governor of the State of Idaho, by virtue of authority in me vested, and after due consultation with the state sheep

inspector, do hereby prohibit the importation, driving or moving into the State of Idaho of all sheep now being held, herded or ranged within said infected districts, viz., the county of Cache, in the State of Utah; the county of Box Elder, in the State of Utah, and the county of Elko, in the State of Nevada, or which may hereafter be held, herded or ranged within said infected districts, for a period of sixty days from and after the date of this proclamation; after the termination of said sixty days sheep can be moved into this State only upon compliance with the laws of the State of Idaho regarding the inspection and dipping of sheep.''

Holding that this was a lawful exercise of the police power of the state and not an undue or unreasonable interference with interstate commerce, Mr. Justice Brewer, speaking for the supreme court, said:

''Plaintiff in error relies largely on *Railroad Company v. Husen*, 95 U. S. 465. In that case the validity of an act of the State of Missouri was presented. The act provided that 'no Texas, Mexican or Indian cattle shall be driven or otherwise conveyed into or remain in any county in this State between the first day of March and the first day of November in each year by any person or persons whatsoever.' It was held to be in conflict with the constitutional grant of power to Congress to regulate commerce between the States. In the opinion the police power of the State, the power by which the State prevents the introduction into its midst of noxious articles, was fully recognized, but attention was called to the fact that there was an absolute prohibition of the bringing in of Texas, Mexican or Indian cattle during eight months of the year, without reference to the actual condition of the cattle, . . .

''It will be perceived that the act was an absolute prohibition operative during eight months of each year. It was an act continuous in its force; provided for no inspection, and was predicated on the assumption that the State had the right to exclude for two thirds of each year the introduction of all those

kinds of cattle, sick or well, and whether likely to distribute disease or not.

"In the case before us the statute makes no absolute prohibition of the introduction of sheep, but authorizes the Governor to investigate the condition of sheep in any locality, and, if found to be subject to the scab or any epidemic disease liable to be communicated to other sheep, to make such restriction on their introduction into the State as shall seem to him, after conference with the state sheep inspector, to be necessary. The executive acted on the authority thus conferred, and, after consultation with the state sheep inspector and examination of the matter, found that the scab was epidemic in certain localities in Utah and Nevada, and that if sheep from those localities were moved therefrom into Idaho they would spread infection and disease among the sheep of the State, and thereupon forbade the introduction of sheep from such localities for the space of sixty days. It will be perceived that this is not a continuous act, operating year after year irrespective of any examination as to the actual facts, but is one contemplating in every case investigation by the chief executive of the State before any order of restraint is issued. Whether such restraint shall be total or limited, and for what length of time, are matters to be determined by him upon full consideration of the condition of the sheep in the localities supposed to be affected. The statute was an act of the State of Idaho contemplating solely the protection of its own sheep from the introduction among them of an infectious disease, and providing for only such restraints upon the introduction of sheep from other States as in the judgment of the State was absolutely necessary to prevent the spread of disease. The act, therefore, is very different from the one presented in *Railroad Co. v. Husen, supra,* and is fairly to be considered a purely quarantine act, and containing within its provisions nothing which is not reasonably appropriate therefor."

In *Smith v. St. Louis & Southwestern R. Co.,* 181 U. S. 248, there was drawn in question a statute of the

state of Texas and a proclamation of the governor of that state issued in pursuance thereof, which proclamation read in part as follows:

"Whereas, the Live Stock Sanitary Commission of Texas has this day recommended the adoption of the following regulations:

". . . The Texas Live Stock Commission having reason to believe that charbon or anthrax has or is liable to break out in the State of Louisiana, from this time forth until the 15th day of November, 1897, no cattle, mules or horses are to be transported or driven into the State of Texas from the State of Louisiana. The Live Stock Sanitary Commission of the State of Texas hereby order that any violation of any of the aforesaid rules and regulations by moving of any cattle, mules or horses north of said bayous, or out of Louisiana into the State of Texas, is contrary to said rules and regulations, and shall be an offense and punishable as provided by the laws of the State of Texas:

"Now, therefore, I, C. A. Culberson, Governor of Texas, in conformity with the provisions of chapter 7, title 102, of the Revised Statutes of Texas of 1895, do hereby declare that the quarantine lines, rules and regulations set forth in the above-recited order of the Live Stock Sanitary Commission of Texas shall be in full force and effect from and after this date."

Mr. Justice McKenna, following a review of the court's decisions in *Railroad Co. v. Husen, supra* and other similar cases, speaking for the court, holding this to be a lawful exercise of the state's police power not unduly or unreasonably interfering with interstate commerce, said:

"The exclusion in the case at bar is not as complete as in the cited cases. That, however, makes no difference if it is within their principle, and their principle does not depend upon the number of States which are embraced in the exclusion. It depends upon whether the police power of the State has been exerted

beyond its province—exerted to regulate interstate
commerce—exerted to exclude, without discrimination,
the good and the bad, the healthy and the diseased,
and to an extent *beyond what is necessary for any
proper quarantine.* The words in italics express an
important qualification. The prevention of disease is
the essence of a quarantine law. Such law is directed
not only to the actually diseased but to what has
become exposed to disease. . . . The good faith
and sincerity of the Texas officers cannot be doubted,
and the statutes under which they acted cannot be
justifiably complained of. The regulations prescribed
are complained of, but are they not reasonably adap-
tive to the purpose of the statutes—not in excess of it?
Quarantine regulations cannot be the same for cattle
as for persons, and must vary with the nature of the
disease to be defended against. As the Supreme Court
of Tennessee said: 'The necessities of such cases
often require prompt action. If too long delayed the
end to be attained by the exercise of the power to
declare a quarantine may be defeated and irreparable
injury done.'

"It is urged that it does not appear that the action
of the Live Stock Sanitary Commission was taken on
sufficient information. It does not appear that it was
not, and the presumption which the law attaches to the
acts of public officers must obtain and prevail. The
plaintiff in error relies entirely on abstract right, which
he seems to think cannot depend upon any circum-
stances or be affected by them. This is a radical
mistake. It is the character of the circumstances which
gives or takes from a law or regulation of quarantine
a legal quality. In some cases the circumstance would
have to be shown to sustain the quarantine, as was
said in *Kimmish v. Ball,* 129 U. S. 217. But the pre-
sumptions of the law are proof, and such presump-
tions exist in the pending case arising from the provi-
sions of and the duties enjoined by the statute and
sanction the action of the sanitary commission and the
Governor of the State."

These decisions in the *Rasmussen* and *Smith* cases,
*supra,* we think, established these general propo-

sitions: (1) A state has the power to exclude from its territory, without specific inspection at the state line, the whole of any commodity sought to be brought into the state from territory which its duly constituted authority has, in pursuance of its law, in good faith found and decided to be so afflicted with some blight or disease as will probably, by the bringing of the given commodity into the state, result, by infection, in material injury to a considerable portion of the property within the state, especially when such property liable to be so infected is in a relatively large measure one of the resources of the state; (2) Such finding and decision of the duly constituted authority of the state, made as provided by its law, is *prima facie* sufficient to support such exclusion of the given commodity coming from any portion of such territory, and that the burden of showing otherwise rests upon the one who attacks the validity of such determination in so far as the invalidity of such determination is rested upon alleged insufficient facts to support its reasonableness. Viewed in the light of the allegations of the complaint above quoted and this presumption, we think the finding, decision and quarantine order of exclusion with reference to shipments of alfalfa hay originating in the territory quarantined against, is not in violation of any of the appellant's rights claimed under the commerce clause of the federal constitution.

It is further contended in behalf of appellant that Chapter 105 of the Laws of 1921 and the quarantine order made in pursuance thereof are rendered ineffectual because of legislation upon the subject-matter thereof having been enacted by Congress; this, upon the theory that such enactment has resulted in superseding all exercise of the power of the state with reference to the subject-matter. Section 8760 of the

United States Compiled Statutes, being § 8 of the act of August 20, 1912, as amended by the act of March 4, 1917, is invoked by counsel for appellant in support of this contention. That section, in so far as it is necessary to here notice its language, reads:

"The Secretary of Agriculture is authorized and directed to quarantine any State, Territory, or District of the United States, or any portion thereof, when he shall determine that such quarantine is necessary to prevent the spread of a dangerous plant disease or insect infestation, new to or not theretofore widely prevalent or distributed within and throughout the United States; and the Secretary of Agriculture is directed to give notice of the establishment of such quarantine to common carriers doing business in or through such quarantined area, and shall publish in such newspapers in the quarantined area as he shall select notice of the establishment of quarantine. That no person shall ship or offer for shipment to any common carrier, nor shall any common carrier receive for transportation or transport, nor shall any person carry or transport from any quarantined State or Territory or District of the United States, or from any quarantined portion thereof, into or through any other State or Territory or District, any class of nursery stock or any other class of plants, fruits, vegetables, roots, bulbs, seeds, or other plant products, or any class of stone or quarry products, or any other article of any character whatsoever, capable of carrying any dangerous plant disease or insect infestation, specified in the notice of quarantine except as hereinafter provided."

This law, it may be conceded, was enacted by Congress looking to the regulation of interstate commerce in so far as horticultural and agricultural products therein mentioned are concerned. We are not advised of any quarantine regulation ever having been made or promulgated with reference to alfalfa hay or alfalfa weevil by the Secretary of Agriculture of which we may take judicial notice. Nor are we advised by proof,

of any such regulation. So this contention is to be considered by us in view of the allegations of the complaint and the provisions of § 8760 above quoted. In other words, it is a question determinable upon the demurrer to the complaint, and we think is answered in favor of the state in this case by the decision of the supreme court of the United States in *Missouri Pac. R. v. Larabee Mills Co.,* 211 U. S. 612.

In that case, there was drawn in question certain local railway switching regulations of the state of Kansas; which regulations, while local, were in the respect drawn in question, of such nature as to be incident to interstate commerce, to the extent that the federal interstate commerce commission could have superseded them in so far as the handling of interstate car shipments were concerned, by their own regulation, which, however, they did not do. After reviewing a number of the court's previous decisions with a view of demonstrating that such local regulations, though incident to interstate commerce, were not rendered nugatory by the mere giving of the power of regulation to the federal interstate commerce commission, they not having acted in that behalf, Mr. Justice Brewer, speaking for the court, said:

"On the other hand, it is said that Congress has already acted, has created the Interstate Commerce Commission, and given to it a large measure of control over interstate commerce. But the fact that Congress has entrusted power to that commission does not, in the absence of action by it, change the rule which existed prior to the creation of the commission. Congress could always regulate interstate commerce, and could make specific provisions in reference thereto, and yet this has not been held to interfere with the power of the State in these incidental matters. A mere delegation by Congress to the commission of a like power has no greater effect, and does not of itself dis-

turb the authority of the State. It is not contended that the commission has taken any action in respect to the particular matters involved. It may never do so, and no one can in advance anticipate what it will do when it acts. Until then the authority of the State in merely incidental matters remains undisturbed. In other words, the mere grant by Congress to the commission of certain national powers in respect to interstate commerce does not of itself and in the absence of action by the commission interfere with the authority of the State to make those regulations conducive to the welfare and convenience of its citizens. Running through the entire argument of counsel for the Missouri Pacific is the thought that the control of Congress over interstate commerce and a delegation of that control to a commission necessarily withdraws from the State all power in respect to regulations of a local character. This proposition cannot be sustained. Until specific action by Congress or the commission the control of the State over these incidental matters remains undisturbed.''

It seems to us that just as the interstate commerce commission had not assumed to act with respect to the local matter incident to the interstate commerce there drawn in question, and that therefore the Federal government had not assumed to act with reference thereto; so the Secretary of Agriculture of the United States has not assumed to act under section 8760 above quoted with reference to the preventing of the possible spread of the alfalfa weevil as a pest, and that therefore the Federal government has not assumed to act with reference thereto. We are of the opinion that the Federal government has not assumed control of the subject-matter in question to the exclusion of state authority with reference thereto.

Some contention is made and briefly argued that Chapter 105, under which the quarantine order here in question was issued, is only an inspection quarantine

law; that is, that the director of agriculture is by its terms only authorized to prevent the bringing of shipments of alfalfa hay within the state upon a specific inspection of each particular shipment at the state line and a determination that any such shipment is infected to the extent of warranting its exclusion, and is not authorized to exclude all shipments solely because of their coming from territory without the state against which the quarantine order runs. There are, it is true, a number of provisions in ch. 105, Laws of 1921, p. 308, *supra,* above quoted which relate to, and in a measure regulate, inspections to be made of agricultural products about to enter the state, with a view of excluding them, if found infected in such manner as to become dangerous to agricultural products of the state. Looking to the provisions of ch. 105, *supra,* as a whole, however, we think that they do not call for such a narrow construction. In section 2 [Rem. Comp. Stat., § 2781], we find the director of agriculture, upon the approval of the governor, given power to ''maintain and enforce such obligatory quarantine regulations as may be deemed necessary to protect the forest, agricultural, horticultural, ornamental and floral trees, shrubs, and plants, and the products thereof in the state of Washington, against contagion or infestation by injurious plant disease insects . . .'' This, we think, is a sufficiently broad power to enable the commissioner of agriculture, with the approval of the governor, to exclude entirely, without the necessity of specific inspection at the state line of each particular shipment, the bringing into the state of alfalfa hay from territory outside the state infected with alfalfa weevil as found, decided and ordered. This brings us to a consideration of those questions arising upon the trial and not finally determinable upon the demurrer to the complaint.

It is contended that the quarantine order is without effect because not properly promulgated or evidenced to the public by proclamation of the governor. Referring to the language of section 3 near the concluding portion thereof, it appears that upon the making of the quarantine order,

"The said director shall at once notify the Governor of all quarantine lines established under or pursuant to this act, and if the Governor approve or shall have approved of the same or any portion thereof, the same shall be in effect and the Governor may issue his proclamation proclaiming the boundaries of such quarantine and the nature thereof, and the order, rules or regulations prescribed for the maintenance and enforcement of the same, and may publish said proclamation in such manner as he may deem expedient to give proper notice thereof." [Rem. Comp. Stat., § 2782.]

It seems by the very terms of the statute that the quarantine order shall be in effect upon its making and approval by the governor, and that the contemplated proclamation by the governor is not necessary to the validity or going into effect of the order. Referring to the concluding language of section 2, we find that the order is to be filed in the office of the secretary of state. This the proof shows was done before any attempt was made to enforce it; and besides, the order was approved by the governor, which approval was endorsed thereon immediately following the signature of the director, though no formal proclamation in the conventional sense seems to have been issued by the governor. We think the approval of the order by the governor in this manner and the filing of it in the office of the secretary of state was in any event a sufficient proclaiming of it by the governor to render it valid and effective. To what extent the order should thereafter be published, it seems clear by the language of

section 3, was wholly a matter within the governor's discretion. The proof shows that appellant and all of the other railroad companies of the state were given actual notice of the order by being furnished copies thereof. We think appellant cannot now be heard to say that the quarantine order was ineffectual for want of proclamation thereof by the governor. The following authorities lend support to this conclusion: *Mackin v. State,* 62 Md. 244; *Cushing v. Hartwig,* 138 Mo. App. 114, 120 S. W. 109; *Dickinson v. Page,* 120 Ark. 377, 179 S. W. 1004.

Touching the branch of the case which counsel for appellant in their brief call "the merits," they contend that:

"The evidence shows that the quarantine order was issued without proper investigation and that it is an unreasonable exercise of the police power of the state."

Assuming, for argument's sake, that such questions, which manifestly are questions of fact, may be considered in this case as they could be were this a direct action by appellant by a suit in equity attacking the quarantine order as being an unreasonable and unwarranted interference with interstate commerce, as was done in *Smith v. Lowe,* 121 Fed. 753, we deem it sufficient to say that the evidence convinces us that the order is not an unreasonable or unwarranted interference with interstate commerce, in that it was issued and promulgated without proper and sufficient investigation on the part of the commissioner of agriculture, or in the absence of the existence of facts reasonably warranting its issuance and promulgation. That the alfalfa weevil has become a serious menace to the alfalfa crop of certain of the northwestern states, comparatively near neighbors of the state of Washington, is, we think, rendered plain by the evidence in this

record. That shipments of alfalfa hay into or through the state of Washington in open cars or box cars in the usual manner, originating in the territory against which this quarantine order runs, will be a serious menace to the crop production of alfalfa hay in the state of Washington, one of its comparatively large resources, we think is also rendered plain by the evidence in this record. That the effectual inspection of each individual shipment of alfalfa hay at the state line coming from the territory against which the quarantine order runs is wholly impractical, if not absolutely impossible, because of the secretive nature of the infection in the stalks of the alfalfa, we think, is also rendered plain by the evidence in this case. There is some room for arguing that the boundary lines of the district quarantined against as defined in the order might have been safely somewhat contracted. This argument, however, we are not persuaded, in the light of the evidence, is one that we should yield to and arrive at a different conclusion upon that question from that arrived at by the commissioner of agriculture. Upon all questions of fact touching the reasonableness of the quarantine order we think the weight of the evidence is on the side of the state.

Some contention is made rested upon the fact that the quarantine order does not make any provision for the shipment of alfalfa hay through the state in sealed containers as contemplated by one of the provisions of § 5 of ch. 105. The evidence shows that the shipments heretofore made by appellant have been for the most part through the state rather than into the state in the sense of coming into the state with their destination therein. We have noticed that the state is not in this case seeking to restrain, and it was not so decreed, the shipping of alfalfa hay through the state

in sealed containers, from the territory quarantined against. The argument seems to be that, since the order does not in terms prohibit the shipment of hay through the state, appellant should not be enjoined from so doing, even in open cars or box cars; that is, that it should not be restricted to the making of such shipments in sealed containers. We are of the opinion, however, in the light of the evidence, that the shipping of alfalfa hay in open cars or box cars in the usual manner through the state from the territory quarantined against, is a menace to our growing crop of alfalfa in the state only in a somewhat less degree than such shipments into the state with their destination therein would be; and that the shipment of alfalfa hay through the state other than in sealed containers, is, under the circumstances, in effect a shipment into the state, within the meaning of the order, and is, therefore, as much a violation of the order as a shipment into the state with the destination of the shipment therein would be. Manifestly, a shipment cannot pass through the state without first coming into the state.

The decree of the trial court is affirmed.

MAIN, C. J., HOLCOMB, TOLMAN, and MACKINTOSH, JJ., concur.