Last November a number of men, of whom several composed the board of directors of the New Jersey Laundry *Page 41 
Owners Association and the others, though not members of the association, were engaged in the laundry business, issued their edict that no laundryman in this state should perform a certain class of laundry service for a charge of less than four cents per pound for washing and six cents additional for ironing. The defendants, in defiance of the mandate, are doing laundry work of the class specified at eight cents a pound. The attorney-general files this bill to compel compliance by defendants and he asks that they be restrained, pending the suit, from charging less than minimum prices so fixed.
The first inquiry searches the source of the authority asserted by the men who have undertaken thus to regulate laundry charges. The attorney-general points to chapter 372 of the laws of 1933, of which the short title is the New Jersey Industrial Recovery act, and especially to the provision which empowers the governor to promulgate codes of fair competition. It appears from the bill that such a code for the laundry industry was approved by the governor October 26th, 1933; that the code sets up a committee called the code authority, and authorizes the code authority to prescribe minimum prices for laundry service; that the men whom I first mentioned constitute the code authority for the laundry industry and that their edict which has been disregarded by defendants was made pursuant to the provisions of the laundry code.
It is the general rule that a complainant cannot have a preliminary injunction when the right on which he founds his claim is subject to serious doubt. The rule applies when complainant relies on a statute, the constitutionality or interpretation of which is an unsettled legal problem. AtlanticCity Water Works Co. v. Consumers Water Co., 44 N.J. Eq. 427.
And when the state, by the attorney-general, seeks the aid of the court, its right to relief is usually determined in accordance with the ordinary rules for the administration of justice. 59C.J. 315.
If the statute does not authorize the creation of a code *Page 42 
authority or if it does not empower the code authority to fix prices, then the very foundation of the bill crumbles. On scanning the statute, it appears that there is no mention of any such body as a code authority. The provisions on which complainant directly relies are found in section 3 which enacts that it shall be lawful for an industrial group to agree "upon a code or codes of fair competition for the trade or industry or subdivision thereof represented by them," and that the governor, under certain circumstances "may approve any such code or codes of fair competition in intrastate commerce in this state." Section 5 provides that a code so approved shall be binding upon all persons engaged in the industry and that "the provisions of any such code or agreement shall be the standard of fair competition for such trade or industry." A violation of the provisions of the code is a misdemeanor. The court of chancery is vested with jurisdiction at the suit of the attorney-general to restrain violations of the code. Section 6.
By the word "code" is usually meant a compilation or revision of a body of law. A broader definition is a system of rules. The New Jersey Recovery act authorizes industrial groups to propose, and the governor to approve, a set of rules defining what is unfair competition and what is fair competition, forbidding the former and sanctioning the latter. It does not expressly authorize, and it does not seem to contemplate the creation by code of any subordinate tribunal to administer or interpret the rules or to make additional regulations. The legislature apparently intended that the rules constituting the code should themselves be the standard of competition and that they should be enforced and carried into effect by indictment or by the injunction of chancery. Certainly enough doubt appears relative to the establishment of the code authority to forbid the granting of an interlocutory injunction.
There is a further difficulty. "Statutes in derogation of common law rights are to be strictly construed and we are not to infer that the legislature intended to alter the common *Page 43 
law principles further than is clearly expressed or that the case absolutely requires." Tinsman v. Belvidere, Delaware RailroadCo., 26 N.J. Law 148, 167. No common law right has been more firmly established or more treasured than the right of the individual to sell his goods or his services at whatever price he and the purchaser might agree upon. Indeed, a few years ago every court in the land would have held that a statute abrogating that right, except in the case of a business or property affected with a public interest, would deprive the individual of his property without due process of law and therefore be void. Tyson andBrother v. Banton, 273 U.S. 418; 47 Sup. Ct. 426; Ribnick v.McBride, 277 U.S. 350; 48 Sup. Ct. 545; Williams v. StandardOil Co., 278 U.S. 235; 49 Sup. Ct. 115. Doubtless judicial conceptions of the power of the legislature to restrict the individual's liberty of contract have been undergoing a change in recent years. Nebbia v. People, 291 U.S. 502;54 Sup. Ct. 505. Doubtless legislative power, usually dormant, may be recalled to activity by the stress of the times. Home Buildingand Loan Association v. Blaisdell, 290 U.S. 398;54 Sup. Ct. 231. But even granting to the legislature the utmost power which has been claimed for it, it must still be conceded that the exercise of such power requires explicit, unambiguous language. It will not be presumed in the absence of such language that the legislature intended to grant to the governor or to any subordinate body, such as the code authority, power to fix minimum prices below which businessmen of New Jersey cannot lawfully sell their goods or services. I turn again to chapter 372. "Fair competition," the only authorized subject of the code, may be taken as the opposite of "unfair competition," a term which has long been employed by the courts. It has generally been understood to mean a form of competition involving deception of the public as by the imitation of trade names, labels, c. The United States supreme court, referring to the Federal Trade Commission act, has said: "The words `unfair method of competition' are not defined by the statute and their exact meaning is in dispute. *Page 44 
It is for the courts, not the commission, ultimately to determine, as matter of law, what they include. They are clearly inapplicable to practices heretofore never regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or to create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade." Federal Trade Commission v.Gratz, 253 U.S. 421; 40 Sup. Ct. 572; Federal Trade Commission
v. Raymond Bros., 263 U.S. 565; 44 Sup. Ct. 162. Price cutting, by itself, has never been considered unfair competition.Sears-Roebuck Co. v. Federal Trade Commission,258 Fed. Rep. 307.
The subject of prices is mentioned only once in the New Jersey Recovery act, namely, in section 7: "Whenever the governor shall find that destructive wage or price cutting or other activities contrary to the policy of this act are being practiced in any trade" and "shall find it essential to license business enterprises in order to make effective a code of fair competition," no one shall carry on business in such trade without obtaining a license. This provision indicates that destructive price cutting is contrary to public policy and that it may render ineffective a code of fair competition and it provides the remedy, namely, licensing. But it is doubtful whether from this provision may be clearly inferred a grant of authority to the code authority to fix minimum prices.
The attorney-general points out that the statute makes numerous references to the National Industrial Recovery act, approved June 16th, 1933, and to codes promulgated thereunder, and states the policy of New Jersey to co-operate in the furtherance of the objects and purposes of title I of the federal law. That title also fails to mention or provide for any code authority or similar body and it mentions prices only once, namely, in a clause similar to the one found in the state act. When the state statute was adopted, September 5th, 1933, five national codes had already been approved by *Page 45 
the president — cotton textiles, lumber, petroleum, iron and steel, automobile manufacturing industry — each providing for an administrator, and three of the codes containing price fixing provisions. It is argued that our legislature accepted this practical construction of the federal statute and that the New Jersey act should be construed accordingly. But this argument, though it might prevail at final hearing, is not so obviously sound as to carry the present motion. Because of the doubt whether the legislature intended to grant to the code authority power to fix minimum prices, the application for an interlocutory injunction must be denied. *Page 46