[No. 25398. *En Banc.* April 11, 1935.]

CHAS. UHDEN, INC., *et al., Respondents,* v. CHARLES W.
GREENOUGH, *as Prosecuting Attorney of Spokane
County, et al., Appellants.*[1]

[1]Reported in 43 P. (2d) 983.

*Tustin & Chandler,* for appellants.

*Richard S. Munter* and *H. E. T. Herman,* for respondents.

*The Attorney General, Geo. G. Hannan, Assistant (E. J. Eagan,* of counsel), *Cheney & Hutcheson, Preston, Thorgrimson & Turner, Allen, Froude & Hilen, Evans & McLaren, Robert M. Burgunder, Arthur M. Hare, Theodore S. Turner, Richards, Gilbert & Conklin,* and *E. W. Anderson, amici curiae.*

HOLCOMB, J.—This action involves the constitutionality and applicability of chapter 12, Laws of 1933, Ex. Ses., p. 26 (Rem. 1934 Sup., § 3035-1 [P. C. § 77-11] *et seq.*), generally referred to as the Washington agricultural adjustment act.

The act first contains what is practically a replica of the Federal agricultural adjustment act in the statement of the necessity for protection of agriculture, and also contains an emergency clause declaring it to be necessary for the immediate preservation of public peace, health and safety, for the preservation of the financial structure of the state, for the preservation of agriculture, to prevent a financial crisis, and for the support of the state government and its existing institutions. By the terms of the act, it is to cease to be in effect at the expiration of two years from the date of its enactment, or sooner if the governor shall

by proclamation declare that the emergency recognized by section 1 of the act has ended.

The act was passed by the legislature on December 30, 1933, and approved by the governor on January 4, 1934, with the exception of § 22 repealing Rem. Rev. Stat., § 6242, vetoed by the governor, which the legislature failed to enact over the veto. The veto of § 22 is of no importance to the decision in this case.

Section 2 of the act reads:

"It is hereby declared to be the policy of the legislature:

"(1) To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the basic period. The basic period in the case of all agricultural commodities shall be the pre-war period, August, 1909—July, 1914.

"(2) To approach such equality of purchasing power by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic markets.

"(3) To protect the consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the pre-war period, August, 1909—July, 1914. It is hereby declared to be the policy of this state to cooperate with and assist the national government in promoting the rehabilitation of agriculture and in eliminating the causes of the collapse of agricultural purchasing power, and to that end to bring about the formulation of marketing agreements as may be approved by the Secretary of Agriculture of the United States and the enforcement of such agreements within

this state between producers and distributors or marketing agencies handling the products of agriculture or subdivisions thereof engaged in transactions in or affecting intrastate commerce therein and those engaged therein in transactions in or affecting interstate or foreign commerce." Rem. 1934 Sup., § 3035-2 [P. C. § 77-12].

Section 4 (Rem. 1934 Sup., § 3035-4 [P. C. § 77-14]) provides that any marketing agreement approved or prescribed by the secretary of agriculture pursuant to the terms of the National agricultural act for such agricultural industry or subdivision thereof, shall be considered as the standard of fair competition in intrastate transactions, and the violation of such standard shall be deemed unfair competition, and shall be unlawful and punishable as a gross misdemeanor.

Section 7 reads:

"In order to effectuate and carry out the declared policy of this state and the provisions of the Agricultural Adjustment Act of the United States, the director of agriculture of this state is hereby vested and empowered (1) to make rules and regulations with the approval of the Governor and to provide for the regulation and control of production, storage, transportation, sale and distribution of the agricultural commodities or products thereof or competing commodities and products thereof for such time as the present economic emergency exists and (2) to enter into marketing agreements with processors, associations of producers, and other persons engaged in the handling, manufacturing, producing, processing, dealing or sale of agricultural commodities or products thereof in this state. The making of any such agreement shall not be held to be in violation of any provisions of the statutes of this state: *Provided,* That no such agreement shall be and remain in force after the termination of this act." (Rem. 1934 Sup., § 3035-7 [P. C. § 77-17]).

Section 8 (Rem. 1934 Sup., § 3035-8 [P. C. § 77-18]) provides for the issuance of licenses or permits by the

director of agriculture to processors, manufacturers, associations of producers, and all other persons engaged in the handling in the current of intrastate commerce of any agricultural commodities or products thereof, or any competing commodities or products thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing legislation or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy of this state and the restoration of normal economic conditions in the marketing of such commodities or products.

Section 8 further provides that the director may, for sufficient cause, revoke any such license, after due notice and opportunity for hearing, for violations of the terms and conditions thereof.

Section 12 reads:

"It shall be unlawful for any person to engage in handling, processing, wholesaling or retailing of any agricultural produce without first having obtained a license. Any person violating the provisions of this act shall be guilty of a gross misdemeanor, and each day during which the violation continues shall constitute a separate offense." Rem. 1934 Sup., § 3035-12 [P. C. § 77-22].

Section 13 (Rem. 1934 Sup., § 3035-13 [P. C. § 77-23]) provides for making reports, if required, by any person engaged in handling, selling or processing any agricultural commodities or products, in writing to the director, upon request, showing the true nature of the transaction.

Section 16 reads:

"As used in this act, the term 'basic agricultural commodity' means wheat, field corn, hogs, beef, poultry, eggs, fruit, and milk and its products, and any regional or market classification, type or grade thereof;

but the director of agriculture shall exclude from the operation of the provisions of this act, during any period, any such commodity or classification, type or grade thereof if he finds, upon investigation at any time and after due notice and opportunity for hearing to interested parties, that the conditions of productions, marketing and consumption are such that during such period this act cannot be effectively administered to the end of effectuating the declared policy with respect to such commodity or classification, type or grade thereof." Rem. 1934 Sup., § 3035-16 [P. C. § 77-26].

Respondents are commission merchants, all located in Spokane, handling and dealing in fresh fruits, vegetables and products as such commission merchants, and have been legally licensed as such under the laws prior to the enactment of chapter 12, *supra*.

It was admitted at the trial in the lower court that a joint control committee of Oregon-Washington melon and tomato producers has promulgated, and the director of agriculture of the state of Washington has approved, an agreement under the act covering, or intended to cover, the sale of melons and tomatoes, fixing a minimum price at which melons and tomatoes can be sold. On behalf of that agreement, it was averred by appellants that the minimum price was arrived at after a careful analysis of the cost of production and the cost of marketing such products, and after taking into consideration the reasonable cost to the consuming public; that a small profit, and in many cases no profit at all, has resulted to the producer or grower; that the public has in no way been forced or compelled to purchase such products at an unreasonable price when the cost of production and marketing of such products are taken into consideration; that, under the preexisting conditions, the marketing in such products was demoralized and tended to

418

discourage the growers from further efforts to produce melons and tomatoes, and because of this fact an emergency existed, which emergency the above act has taken into consideration, and attempted to remedy the evil results existing under the old system referred to in it.

Respondents alleged that there was no emergency due to low prices of such agricultural products handled in the current of trade by each and all of them; that the price to farmers for the agricultural products handled in the current of trade by each and all of them were higher in price with respect to the purchasing power of such agricultural commodities than were such prices during the basic period adopted in the act, being August, 1909, to July, 1914; that the only marketing agreement prescribed or approved by the director, i. e., that commonly known as the melon and tomato marketing agreement, is responsible for a fixed price for melons and tomatoes greatly in excess of the price of melons and tomatoes during the basic period stated in the act; that, because such marketing agreement has caused to be fixed a price for tomatoes and melons in excess of what the public, i. e., the consumer, will pay for any substantial portion of these crops, respondents and each of them will be compelled to return to the farmers unsold melons and tomatoes delivered by the farmers to them for sale, in the event they agree to abide by any marketing agreement prescribed or approved, or to be prescribed and approved, by the director.

Respondents also alleged, and it was admitted, that appellants threatened the wrongful arrest and prosecution each and every day of each and all of respondents for failure to procure a license, which they or either of them are not required to have, and which can only be procured by each of respondents by the pay-

ment of an additional license fee and entering into an agreement that he, they or it will comply with the terms and conditions of any marketing agreement approved or prescribed by the director. It is further alleged that the act violates the constitution of the United States and the state constitution, in that it requires by its terms that respondents and each of them, in order to conduct their businesses, must obtain a license, and makes no provision for the issuance of such license except upon application and agreement on the part of the applicant that he will comply with all terms and conditions of any marketing agreement approved or prescribed by the Federal secretary of agriculture or by the director of agriculture of Washington.

Further allegations were made that the act violates the fourteenth amendment to the Federal constitution and violates or disregards the following provisions of the constitution of Washington: §§ 1, 3, 7, 12, 16 and 23 of Article I; § 1, Article IV; the seventh amendment, being the amendment to § 1, Article II; and the tenth amendment, being the amendment to § 22, Article I, and § 22, Article XII.

The trial judge granted a temporary injunction to respondents, but apparently did not pass upon the constitutionality of the act, basing his action upon the arbitrary acts of the administrators of the act as being beyond the authority of the act itself in the present case "without impugning the general purpose and operation of the act."

It is suggested by several counsel appearing as *amici curiae* that respondents are in no position to seek redress in the courts because they have never attempted to secure licenses under the new act, nor to seek redress before the administrators of the law as provided therein. Each and all of respondents were

threatened with immediate and daily prosecution for the gross misdemeanor created by the law, unless they applied for licenses under the new act and agreed, among other things, to comply with any lawful orders of the director. Being thus threatened, they had the undoubted legal right to challenge the validity of the law and resist its enforcement as against them by injunction without awaiting prosecution. *Huntworth v. Tanner,* 87 Wash. 670, 152 Pac. 523, Ann. Cas. 1917D, 676.

We shall also ignore the lack of finality of the injunction ordered, since appellants and all parties concede that it was to be considered as a final judgment after a complete hearing of the case and because of the vast importance to the parties and the public of a construction of the law.

Able and copious briefs have been furnished us by the parties and by the several *amici curiae* arguing the case by leave of court, pro and con. We are unable to agree with many of the contentions of counsel for the parties or of *amici curiae.* Although we realize the immense import of our decision on this law, on account of the complexity of the argument it will not be expedient to discuss many of the questions. Lack of discussion, however, does not indicate lack of studious consideration of all points. Neither shall we discuss any of the constitutional provisions except those we consider essentially involved, and for the further reason that none of respondents is immediately affected by any of those constitutional provisions except those we shall discuss in this opinion. *State v. Bowen & Co.,* 86 Wash. 23, 149 Pac. 330, Ann. Cas. 1917B, 625; *Northern Cedar Co. v. French,* 131 Wash. 394, 230 Pac. 837; *Garretson Co. v. Robinson,* 178 Wash. 601, 35 P. (2d) 504.

We also proceed upon the presumption that an act

of the legislature will be presumed to be valid unless there is no reasonable doubt as to its validity. *State v. Bowen & Co., supra; Litchman v. Shannon,* 90 Wash. 186, 155 Pac. 783; *Standard Oil Co. v. Graves,* 94 Wash. 291, 162 Pac. 558; *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P. (2d) 1; *State ex rel. Stiner v. Yelle,* 174 Wash. 402, 25 P. (2d) 91.

■ It is so well settled in this state, and almost universally elsewhere in the country, as to need no citation that the legislature has power to license commission merchants or other dealers in agricultural products in the interest of proper inspection to prevent evasion, fraud and imposition. It has also been settled in this state by former decisions that commission merchants can be regulated and licensed. *State v. Bowen & Co., supra; Northern Cedar Co. v. French, supra;* and *Garretson Co. v. Robinson, supra.* If that be true, the state can afterwards impose additional regulations and exactions upon the same commission merchants, under the police power of the state, if such regulations are constitutionally enacted. Licenses theretofore granted may be revoked, even without notice to the licensee, for violation of the terms of the license, without depriving the licensee of property without due process of law. *Monamotor Oil Co. v. Johnson,* 292 U. S. 86, 54 S. Ct. 125, 78 Law Ed. 706. Consequently, there is no merit in the contention of respondents that the act before us, if otherwise constitutional, violates the provisions as to non-impairment of contract and the due process of law restrictions of the Federal and state constitutions.

■ Respondents and some of *amici curiae* make the further contention that the act violates § 22 of Article XII of our state constitution, which reads:

"Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership,

or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees, or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever, for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity. The legislature shall pass laws for the enforcement of this section by adequate penalties, and in case of incorporated companies, if necessary for that purpose, may declare a forfeiture of their franchise.''

A minority of this bench probably agree with that contention, but the majority are against it. That provision is plainly for the prevention of combinations of persons, or associations, for the purpose of fixing the price or limiting the production of any product or commodity, directly or indirectly, thus creating private monopolies against the public welfare, but does not apply to the state itself if it should determine to establish or foster a monopoly for the production of any agricultural product, for the advantage of its people. The cases cited to sustain that contention, particularly: *Washington Cranberry Growers Association v. Moore,* 117 Wash. 430, 201 Pac. 773, 204 Pac. 811, 25 A. L. R. 1077; and *American Export Door Corporation v. Gauger Co.,* 154 Wash. 514, 283 Pac. 462, all dealt with such private monopolies, but are not apt here. *State ex rel. Department of Public Works v. Inland Forwarding Corporation,* 164 Wash. 412, 2 P. (2d) 888, in which that constitutional prohibition was invoked by appellant, dealt with the regulation of the state's own highways and the licensing of motor vehicles thereon for the transportation of passengers and freight, where it was further contended that the granting of such certificates of convenience resulted

in monopolies contrary to the above quoted section. We held that it was not violated, and the case has no controlling force in this case.

 Appellants and several *amici curiae* forcefully argue that, since two recent decisions by the United States supreme court in cases of great public emergency, such as has been declared by the legislature in this act, the state has unlimited authority to enact such legislation as this.

The first case relied upon is *Home Building & Loan Association v. Blaisdell,* 290 U. S. 398, 54 S. Ct. 231, 88 A. L. R. 1481, which involved the Minnesota mortgage moratorium law, an emergency act with a limited duration, which the supreme court of Minnesota sustained and the United States supreme court sustained against the contentions that it was repugnant to the contract, due process, and equal protection clauses of the Federal constitution. The next case is *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469.

We shall make no extended review of those cases, because it seems that their operation and effect has been explained and somewhat limited in subsequent cases by that court. See *Worthen Co. v. Thomas,* 292 U. S. 426, 54 S. Ct. 816, 93 A. L. R. 173; *Borden's Farm Products Co. v. Baldwin,* 55 S. Ct. 187. In the last cited case, Mr. Chief Justice Hughes, writing the majority opinion for the court, referring to the *Nebbia* case, *supra,* among other things, said:

"Respondent's counsel, referring to the difficulties of price regulation, say that 'Apparently the fixing of prices by government discovered as many troubles as were loosed from Pandora's box.' This complexity of problems, however, makes it the more imperative that the Court in discharging its duty, in sustaining governmental authority within its sphere and in enforcing individual rights, shall not proceed upon false assumptions."

In the *Nebbia* case, *supra,* by a five to four decision, that court seemed to go to the limit in sustaining the price fixing law of New York as to milk, based on extensive investigation reported to its legislature, which was declared by the court of appeals of New York to be an article of paramount importance to the people of New York, in its decision in the same case *(People v. Nebbia,* 262 N. Y. 259, 186 N. E. 694).

There is grave doubt whether the Federal supreme court would sustain the inclusion of melons and tomatoes in this state as of paramount importance to the people of this state, and so justify the legislation regulating production and fixing prices. That court has also said that a state law may be invalid in some phases and perfectly valid in others. That question is, however, unnecessary here to determine.

The act before us is invalid under our constitution for one sole violation thereof, as it is incomplete and abdicates the legislative power.

Section 7 of the act authorizes the director of agriculture to make rules and regulations with the approval of the governor, and to provide for the regulation and control of production, storage, transportation, sale and distribution of the agricultural commodities or products thereof or competing commodities and products thereof, for such time as the present economic emergency exists; and to enter into marketing agreements with processors, associations of producers, and other persons engaged in the handling, manufacturing, producing, processing, dealing or sale of agricultural commodities or products thereof, in this state.

It is manifest that, under sections 2 and 7, the legislature attempted to delegate legislative power to the national secretary of agriculture and the state director to fix prices of agricultural products upon the basis

of the August, 1909, to July, 1914, period. Melons and tomatoes, however, were nowhere included in the act as basic agricultural commodities, which, under § 16, consist only of wheat, field-corn, hogs, beef, poultry, eggs, fruit, and milk and its products, and any regional or market classification, type or grade thereof.

But little attention is paid to § 16 by any of counsel, which we consider of grave importance. Little attention is paid by respondents in argument to it, but more by some of *amici curiae,* to the seventh amendment to our state constitution, replacing § 1, Article II, of the original constitution, which is, in substance, that, subject to the reserved power of the people to initiate and bring about referendums by the people, the legislative authority of the state shall be vested in the legislature, consisting of a senate and house of representatives which shall be called the legislature of the state of Washington.

It is obvious that §§ 2 and 7, in delegating such power to the Federal secretary of agriculture, the state director, and the governor, are beyond the power of the legislature. The legislative power is vested exclusively in the legislature except so far as modified by the initiative and referendum provisions, and cannot be surrendered or delegated or performed by any other agency. *In re Opinion of the Justices,* 239 Mass. 606, 133 N. E. 453. To the same effect is *State v. Intoxicating Liquors,* 121 Me. 438, 117 Atl. 588; *Phenix Insurance Co. v. Perkins,* 19 S. D. 59, 101 N. W. 1110; *Wylie v. Phoenix Assurance Co.,* 22 P. (2d) (Ariz.) 845.

It is obvious that § 2 of the act is vague and indefinite in prescribing the standard by which the objects of the act are to be effectuated. There is no primary, definite standard of action by which the director of

agriculture and governor of this state are to be governed. We have repeatedly said that

"The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Spokane Hotel Co. v. Younger,* 113 Wash. 359, 194 Pac. 595, and cases cited.

That principle was recognized in *Vail v. Seaborg,* 120 Wash. 126, 207 Pac. 15, and in *State v. Oregon-Washington Railroad & Navigation Co.,* 128 Wash. 365, 223 Pac. 600.

See, also, *State ex rel. Makris v. Superior Court,* 113 Wash. 296, 193 Pac. 845, 12 A. L. R. 1428; *Vincent v. Seattle,* 115 Wash. 475, 197 Pac. 618; *Seattle v. Gibson,* 96 Wash. 425, 165 Pac. 109.

In the *Vail* case, *supra,* this court court quoted and approved a principle announced in *State v. Normand,* 76 N. H. 541, 85 Atl. 899, to the effect that the legislature cannot delegate its power to make a law, but it can make a law to delegate the power to an administrative officer to determine a fact or condition of affairs in regard to which the law makes its own action depend. That was a quotation from a Federal case in which it had been held that Congress could not delegate its power to make a law. *Dastervignes v. United States,* 122 Fed. 30.

On the other hand, regulations made by executive officers are valid only as subordinate to a legislative policy sufficiently defined by statute, and when found to be within the framework of such policy. *Panama Refining Co. v. Ryan,* 55 S. Ct. 241.

In that case, it was decided that all legislative power under the Federal constitution by virtue of Art. 1, § 1, and Art. 1, § 8, was vested in the Congress of the United States consisting of a senate and house of rep-

resentatives, which is empowered thereby to make all laws which shall be necessary and proper for carrying into execution its general powers. It was there emphatically declared that

"The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adopted to complex conditions involving a host of details with which the national Legislature cannot deal directly."

Many instances of laws and decisions in which there had been such delegation of *a part* of the legislative power to fill up the details under the general provision made by the legislature were cited in the opinion.

It was accordingly therein held that there would be no unconstitutional delegation of legislative power by Congress in leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply; but that a delegation of legislative power to an administrative officer is not brought within the permissible limits of such delegation by prescribing the public good as the standard for the administrative officer's action.

It is also there held that, when a penalty or fine or imprisonment, or both, attaches to each violation of an executive order, the jurisdiction of equity is properly invoked to restrain its enforcement if it and the statute under which it is issued is found to be invalid. That accords with our rule of decision in this state as shown by the *Huntworth* case, *supra*.

The decision in the *Panama Refining Co.* case, *supra*, is very long, and most of its reasoning is very persuasive here. It was written by Chief Justice Hughes, and it is dissented from by only one justice (Cardozo).

In the instant case, the melon and tomato code is

brought into existence merely by an arbitrary edict and fiat of the governor of this state and the state director. Section 16 enumerates several products as "basic agricultural commodities," but makes no reference, directly or indirectly, to "melons or tomatoes." No direct authority was given in the act for such edict, and the effect is as an arbitrary and oppressive act. *Hegeman Farms Corporation v. Baldwin,* 55 S. Ct. 7. Cf. *Wilentz v. Crown Laundry Service,* 116 N. J. Eq. 40, 172 Atl. 331.

While § 2 of the act merely declares the legislative policy of the state and would not alone be an unconstitutional provision, when read in conjunction with §§ 4 and 7, constitutes an invalid attempt to delegate legislative power and renders the act unconstitutional. It is not competent for the legislature to abdicate its own power and to so delegate it to any executive or administrative officers, regardless of the worthiness of the present grantees.

The legislature is bound by the constitution when enacting legislation, and so are we in construing legislation. Even though in the presence of dire financial and agricultural calamities, the constitution cannot be set aside. It would seem that even Congress may not delegate to such agency as it selects its entire legislative power. Our legislature has done no more than Congress did in industrial recovery act in delegating such powers to the president, which the United States supreme court annulled.

This is determinative of the instant case.

Having reached the above conclusion, the order of the trial court is affirmed.

MILLARD, C. J., BEALS, and MITCHELL, JJ., concur.

TOLMAN, J. (concurring in the result only)—In my opinion, the act here involved could be and should be

upheld, and the judgment of the trial court should be reversed, were it not for the mandatory provisions of § 22 of Article XII of our state constitution quoted by the majority.

I am well aware of, and in sympathy with, the rule so well stated by the majority to the effect that all intendments are in favor of the constitutionality of a legislative act; and yet, even though I stand alone or nearly so, still I cannot refrain from saying that to hold that this provision of the constitution does not apply to the state, to its officers, or to the legislature, is to place the legislature above and beyond the constitution.

Clearly, the constitution itself fixes the public policy of the state, and if the legislature may, notwithstanding, provide for the monopolization of farm products, it may likewise provide for the monopolization of any and every other commodity which may be dealt in commercially. This would be to amend the constitution by reading into it a provision to the effect that, instead of passing laws for its enforcement, the legislature may pass any law it pleases to override the constitutional injunction that "monopolies and trusts shall never be allowed in this state."

In my opinion, the act should be held to be unconstitutional so far as it attempts to fix prices and to create a monopoly.

I therefore concur in the result only.

STEINERT, J. (concurring)—The majority opinion affirms the order of the trial court. I concur in the affirmance, for the following somewhat alternative reasons:

(1) If it be said, as it may be said, that the act, on its face, did not purport to fix prices, then the

director of agriculture has exceeded his authority in promulgating the order complained of.

(2) On the other hand, if it be said, as it has been argued, that the director has the authority under the act to fix prices, then, in my opinion, there are at least two conclusive answers to the contention: (a) It is the firmly established common law right of the individual to sell his commodities or his services at whatever prices that he and his purchasers may agree upon. If the individual is to be deprived of this common law right, it must be by a statute that clearly and unequivocally expresses that intention. Section 7 of the act, upon which reliance for the exercise of that power is rested, is too vague and inferential to support any conclusion having such sweeping and well-nigh revolutionary changes in traditional concepts of the law. (b) The act is an unauthorized delegation of legislative power. It is, in effect, an abdication of power. It tells the director to make such rules and adopt such standards as he may see fit, in order to bring about conditions obtaining in the basic, or pre-war, period, August, 1909—July, 1914. The legislature has not fixed any standard at all; it has merely expressed a hope that the genius of the director may in some way devise one. If the legislature may legally invest a director with such power in a few things, it may constitute a dictator with similar powers in all things.

Main, J. (concurring)—Upon the question of monopoly, I am much in accord with the views expressed by Judge Tolman. There is, however, another feature of this case which seems to me to be of primary importance. The agricultural adjustment act, which we now have under consideration, provides for three things which, in my opinion, were beyond the power of the legislature: First, it authorizes the director of agri-

culture to limit the production of agricultural products; second, while not saying so in terms, the act is essentially one of price fixing; and third, it gives to the director of agriculture the power to determine the number of persons that may be engaged in the wholesaling of agricultural products in a particular community or city.

It may be admitted that all businesses are subject to some measure of public regulation, and that, in the interest of the public health, the production and sale of agricultural products may be regulated. This, however, is a very different thing from fixing the price, limiting the production, and determining who shall, and who shall not, engage in the business of selling such products.

In *New State Ice Co. v. Liebmann,* 285 U. S. 262, 52 S. Ct. 371, the court had under consideration a statute of the state of Oklahoma which declared that the manufacture, sale and distribution of ice was charged with a public interest, and forbade anyone engaging in that business without first having procured a license from the state commissioner. It was there said:

"It must be conceded that all businesses are subject to some measure of public regulation. And that the business of manufacturing, selling or distributing ice, like that of the grocer, the dairyman, the butcher or the baker may be subjected to appropriate regulations in the interest of the public health cannot be doubted; but the question here is whether the business is so charged with a public use as to justify the particular restriction above stated."

The court in that case held the law unconstitutional, and in the opinion it was also stated:

"It may be quite true that in Oklahoma ice is not only an article of prime necessity, but indispensable; but certainly not more so than food or clothing or the shelter of a home. And this court has definitely said

that the production or sale of food or clothing cannot be subjected to legislative regulation on the basis of a public use; . . ."

Whether a particular business or industry is affected with a public use, is essentially a question of fact.

Much has been said about the case of *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469, where it was held that the milk industry in the state of New York was charged with a public interest. The holding in that case was based upon the findings of a legislative committee of the state of New York, which "held 13 public hearings, at which 254 witnesses testified, and 2,350 typewritten pages of testimony was taken." There is no such showing in the present case, and the dogmatic declaration of the legislature is not sufficient to charge a particular business or industry with a public use. If a business or industry is charged with a public use, it, of course, would be subject to regulation the same as a public utility may be regulated as to its charges and service. The *Nebbia* case is not authority for the proposition that the production and distribution of milk, under any and all conditions, are charged with a public use. The holding in that case, as I understand it, was based solely upon the facts as they existed in the state of New York, and as found by the legislative committee.

As I view the case now before us, as already indicated, the real question to be determined is the constitutionality of the law, and I am of the view that, if the law be held constitutional, then there is no unlawful delegation of legislative authority, because such a law can only be carried out through administrative officers. In my opinion, however, the law is unconstitutional because the legislature itself had no power to fix the price, limit the production, or control the number of

persons that should engage in the business of whole-saling agricultural products.

For the reasons herein stated, I think the judgment of the superior court in this case should be affirmed.

BLAKE, J. (dissenting)—I am impelled to dissent for the following reasons:

First: However inartificially an act of the legislature may be drawn, however obvious its defects may be, I am unalterably opposed to holding it unconstitutional on so meagre a record as is presented to us in this case.

Second: I do not think the complaint states a cause of action.

Third: So far as these plaintiffs are concerned, I do not think there is any unconstitutional delegation of legislative power to the director of agriculture under the terms of chapter 12, Laws of 1933, Ex. Ses., p. 26 (Rem. 1934 Sup., § 3035-1 [P. C. § 77-11] *et seq.).*

I. The record upon which the court has denounced this act as unconstitutional consists of the amended complaint, an application for a temporary injunction, an affidavit by an officer of one of the plaintiff corporations in support of the application, and two affidavits by employees in the department of agriculture in resistance to the application. There is, indeed, a so-called statement of facts. This, however, contains no evidence of any character. It consists wholly of a colloquy (preliminary to argument) between the court and counsel for the respective parties. The sum and substance of this colloquy is that counsel for plaintiffs, in effect, said: "We are here contending that this act is unconstitutional for many reasons," and counsel for defendants said: "It is not unconstitutional for any reason." Nowhere in the record, so far as I can find, does there appear any order, or the resume of any

order, made or proposed to be made by the director of agriculture. It is assumed that he has made an order with respect to the price commission merchants are to charge the consumer for melons and tomatoes sold for producers on commission. We can only guess as to what the contents of that order may be. Whatever they may be, the court has, in a sweeping decision, held that the director was without power to make the order. I cannot lend my assent to the holding of any legislative enactment unconstitutional in such a summary manner.

It has become trite to say that every intendment is extended to a legislative act in favor of its constitutionality; that the court will not declare an act unconstitutional unless from the record it can be said that its unconstitutionality is established beyond all reasonable doubt. The act here under consideration itself contains the following provision:

"If any section, sentence, clause or part of this act is for any reason held to be unconstitutional, such decision shall not affect the remaining portions of this act. The legislature hereby declares that it would have passed this act and each section, sentence, clause or part thereof, irrespective of the fact that one or more sections, sentences, clauses or parts hereof be declared unconstitutional." (Rem. 1934 Sup., § 3035-19 [P. C. § 77-29].)

In this decision, the court has neither accorded the act the presumption of constitutionality nor given force to the provision of the act just quoted.

II. The complaint in this action, stripped of verbiage, simply alleges that the plaintiffs are commission merchants — middlemen — engaged in handling agricultural products on a commission basis; that they have heretofore paid a license fee as a prerequisite to engaging in that business; that the defendants will prefer criminal charges against them unless they take

out an additional license under the terms prescribed in chapter 12, Laws of 1933, Ex. Ses., p. 26 (Rem. 1934 Sup., § 3035-1 [P. C. § 77-11] *et seq.);* that they have a right to handle the producers' property under the law of supply and demand. They allege specifically:

"That there is involved in the threat of defendants, and each of them, to arrest and prosecute the plaintiffs as aforementioned, for the aforesaid reasons, a question of public interest and convenience, in that they handle a large portion of the fruits and vegetables disposed of in and on behalf of producers, marketed in said Spokane county, and the public is vitally interested in the question whether the producers and consumers of Spokane county, Washington, can be affected by the terms and conditions of any marketing agreement approved or prescribed by the said director of agriculture, *and deprived of the benefits of free and unrestricted traffic in fruit and vegetables . . .*"

Now, it is to be remembered that these plaintiffs are not producers. Neither are they here in the capacity of consumers. It is an elementary principle of statutory construction that the court will not hold a legislative enactment unconstitutional at the behest of one whose constitutional rights are not affected.

Until now, I had believed, or, rather, had hoped, that the philosophy of Mr. Justice Holmes' dissenting opinion in *Lochner v. New York,* 198 U. S. 45, 25 S. Ct. 539, had come to be accepted as the standard by which constitutional guarantees, in rights to property, were to be determined. The philosophy of his opinion, as I understand it, is this: that the rights to own, use and dispose of property, guaranteed by the constitution, do not include mere privileges enjoyed under the economic system known as laissez faire. The effect of the decision in this case is to establish in plaintiffs a property right in the law of supply and demand. (And, as I understand the complaint, that is the gist of the

relief sought.) It must not be forgotten that the plaintiffs are simply middlemen, handling other people's property. They are not here seeking to restrain the director of agriculture from fixing a price at which their own property may be sold. They claim the right to sell the producers' property on an open market at a price determined by consumer demand. And by this decision they are accorded that right as a property right guaranteed by the constitution.

The question in this case, as I see it, is whether the business of the middleman, solely as such, is subject to regulation and control by the state. His very business (regardless of the commodity handled), affecting, as it does, the producer on the one hand and the consumer on the other, is surcharged with public interest.

It seems to be conceded by all economists that the holocaust that has befallen us during the past five years is largely due to the breakdown of the mechanism of distribution. The middleman is an essential cog in that mechanism. How the breakdown can be repaired without the intervention of the government, is beyond my comprehension. That the government has the power to intervene and repair and adjust that mechanism, seems to me to be unquestionable. The majority opinion seems to concede the power, but concludes that it has not been properly exercised in chapter 12, Laws of 1933, Ex. Ses., p. 26; that, under that act, there has been an unconstitutional delegation of power to the director of agriculture.

III. It seems to me that this conclusion has been reached under a misapprehension of who these plaintiffs are and what the act provides with respect to their activities in handling agricultural products. The act is very general in terms, except in one aspect, and that is the aspect which affects the plaintiffs. In respect to the activities of the middleman, the act could

hardly be more explicit. Sections 8 to 14, inclusive, are wholly devoted to the licensing of "processors, manufacturers, associations of producers, and *all other persons engaged in the handling* in the current of intra-state commerce of any agricultural commodities." With the exception of §§ 10, 11 and 14, a resume of these sections has been set out in the majority opinion. Sections 10 and 11 provide a method for revocation of licenses for cause; § 14 relates to the amount of license fees.

The provisions of the act leave to the director of agriculture nothing but administrative functions with respect to the licensing and regulation of middlemen. In this respect, the act is as circumstantial as the act subjecting carriers on the highways to the regulation and control of the director of public works.

It does not seem to me that, in view of the explicit provisions of §§ 8 to 14, inclusive, of chapter 12, the majority opinion in this case can be soundly rested on the theory that there has been an unconstitutional delegation of legislative power to the director of agriculture. Rather, the conclusion must, of necessity, rest upon the assumption that the director will unlawfully exercise the powers delegated.

I think, on the record here presented, that assumption is unwarranted. It is not to be presumed that the director has promulgated, or will promulgate, unlawful orders. At any rate, plaintiffs are in no position to question the director's orders until they themselves have complied with the law by taking out licenses.

GERAGHTY, J. (dissenting)—For the reasons given in my dissenting opinion in *Griffiths v. Robinson, post* p. 438, 43 P. (2d) 977, I think the judgment of the lower court should be reversed.