McDONALD et al. v. AMERICAN FRUIT GROWERS, Inc., et al. *

No. 10645.

Court of Civil Appeals of Texas. San Antonio.

March 15, 1939.

Rehearing Denied March 24, 1939.

*Writ of error dismissed 127 S.W.2d 291.

84

Gerald C. Mann, Atty. Gen., Dick Stout, Asst. Atty. Gen., McDaniel & Catlett, of McAllen, and Cameron & Hardin, of Edinburg, for appellants.

Seabury, Taylor & Wagner, of Brownsville, Luther Hughes, of Weslaco, and Strickland, Ewers & Wilkins and Hill, Greer & Franki, all of Mission, for appellees.

MURRAY, Justice.

This is an appeal by J. E. McDonald, Commissioner of Agriculture of the State of Texas, C. E. McCormick, an employee of the Department of Agriculture of the State of Texas, and W. D. Woodroof, a resident of Hidalgo County, who was acting under some authority from J. E. McDonald, from a judgment of the 93rd District Court of Hidalgo County, granting a temporary injunction to the American Fruit Growers, Inc., and six other petitioners. The six other petitioners below were: Texas Citrus Fruit Growers Exchange, Rio Grande Valley Citrus Exchange, Mission Fruit and Vegetable Company, a corporation, Burkhart Fruit and Vegetable Company, a corporation, C. D. Kirk, operating as C. D. Kirk and Company, Logan and Paxton, a partnership composed of Dan Logan and J. R. Paxton. All of the petitioners may be described generally as handlers of citrus fruit in the Rio Grande Valley.

The Commissioner of Agriculture had either suspended or was threatening to suspend the license to handle citrus fruit of the petitioners, because they were alleged to have violated an order made by the Commissioner fixing a minimum price for citrus fruit on the tree.

The question here presented is whether or not the Commissioner of Agriculture has authority to make an order fixing a minimum price for citrus fruit on the tree, and whether or not he has authority to cancel or suspend the licenses of the petitioners (who are the appellees herein) if they attempt to handle citrus fruit without first paying the minimum price therefor or seeing to it that such fruit is sold at such a price as to net the minimum price to the grower.

The Commissioner relies upon the Texas Citrus Marketing Act, Acts 1937, 45 Leg. House Bill No. 654, c. 362, p. 724, Art. 5764a, Vernon's Texas Statutes, 1938 Supplement, for his authority to make orders fixing a minimum price for citrus fruit on the trees, and to compel observance of such orders by cancelling or suspending the license of handlers who violate the same. Thus we are called upon to determine whether or not the Texas Citrus Marketing Act authorizes the Commissioner of Agriculture to make and enforce such orders. We are of the opinion that if the Commissioner of Agriculture has any possible authority to make an order fixing a minimum price of citrus fruit on the tree, such authority must be found in §§ 7, 8 and 12 of the act which read as follows:

"Sec. 7. Marketing agreements executed and licenses issued pursuant to this Act shall contain one or more of the following terms and conditions and no others, except as provided in Section 6 of this Act:

"(1) Limiting, or providing methods for the limitation of the total quantity of any variety of citrus fruit, or of any grade, size, or quality thereof, produced during any specified period or periods, which may be marketed in, or transported to, any or all markets in intrastate commerce.

"(2) Allotting, or providing methods for allotting, the amount of citrus fruits, or any grade, variety, size, or quality thereof, which each handler may market in or transport to any or all markets other than in the current of interstate or foreign commerce or so as directly to burden, obstruct, or affect interstate or foreign commerce in such citrus fruits, under a uniform rule based upon (1) the amounts of such citrus fruits, or any grade, variety, size, or quality thereof, which each such handler has available for current shipment, or (2) upon the amounts shipped by each such handler in such prior period as the Commissioner determines to be representative, or both, to the end that the total quantity of such citrus fruits, or any grade, variety, size, or quality thereof, to be marketed in, or transported to any or all markets, other than in the current of interstate or foreign commerce, or so as directly to burden, obstruct, or affect interstate or foreign commerce in such citrus fruits, during any specified period or periods, shall be equitably apportioned among all of the handlers thereof.

"(3) Determining, or providing methods for determining, the existence and extent of the surplus of such citrus fruits, or of any grade, variety, size, or quality thereof, and providing for the control and disposition of such surplus, but so as not to burden or obstruct interstate or foreign commerce in such citrus fruits, and for equalizing the burden of such surplus elimination or control among the producers and handlers thereof.

"Sec. 8. Marketing agreements executed and licenses issued under this Act shall, in addition, contain one or more of the following terms and conditions:

"(1) Providing for the selection by the Commissioner, or a method for the selection by the Commissioner, of an administrative committee or committees and defining their powers and duties. Such powers shall be limited:

"(a) To administering such license in accordance with its terms and provisions;

"(b) To making rules and regulations to effectuate the terms and provisions of such license;

"(c) To receiving, investigating, and reporting to the Commissioner complaints of violations of such license;

"(d) To recommending to the Commissioner amendments to such license;

"(e) To collecting from each handler a fee or assessment representing his pro rata share of such estimated expenses, including expenses incurred in hearings held on, and in the execution of such marketing agreement, as the Commissioner, after the submission to him by such administrative agency or agencies of a proposed budget, finds will probably be required to cover expenditures necessarily to be incurred by such agency or agencies, during any period specified by him, for the maintenance and functioning of such agency or agencies; to receiving, expending, and accounting for the funds so collected, and to return to such handler his pro rata share of any unexpended balances which the administrative committee or committees, with the approval of the Commissioner, finds are not so required.

"(2) Any other terms and conditions incidental to, and not inconsistent with, the terms and conditions specified in Section 7."

"Sec. 12. Whenever the Commissioner shall have reason to believe that an amendment of any marketing agreement or license is necessary, or desirable, in order to effectuate the policy of this Act, he shall call a hearing upon such amendment. Such hearing shall be held in the same manner and upon the same notice as upon an original marketing agreement or license. The notice of hearing shall refer by name and date of execution of the agreement or to the issuance of license, or both, to which the amendment is proposed. At such hearing the Commissioner shall receive and hear evidence offered for and against the proposed amendment by any interested person.

"If upon such hearing upon said proposed amendment it shall be found by the Commissioner that the following facts actually exist:

"1. The proposed amendment will not prevent such marketing agreement and license, or either, from meeting the requirments of Section 5 of this Act;

"2. The proposed amendment will tend to facilitate the administration of such marketing agreement and license, or will enable such marketing agreement and license to better meet the requirements of Section 5 of this Act; he shall make written findings to that effect, and shall execute such amendment to such marketing agreement, or shall issue such amendment to such license, or both. If the Commissioner shall find against the existence of any of the facts required to be present under this Section, he shall not issue such amendment to such marketing agreement or license. Such findings, if against the existence of any such facts, shall in no way impair or affect the marketing agreement or license to which said amendment was proposed.

"In considering such amendment, the Commissioner shall take into consideration the evidence presented at the original hearing on the marketing agreement, or license to which such amendment is proposed, and upon any prior amendment thereto.

"No amendment to a marketing agreement or license shall be effective until approved in the same manner as required by Section 9 of this Act for the original marketing agreement or license to which such amendment was proposed."

■ Section 7 provides that marketing agreements executed and licenses issued pursuant to this Act shall contain one or more of the following terms and conditions and no others, except as provided in Section 6. The reference to Section 6 is evidently a typographical error, as section 6 does not contain any reference to what may be provided in the agreements or licenses. The reference must have been intended to be Section 8, as that section does contain further provisions as to what may be placed in such agreements and licenses.

■ It is clear that the Commissioner may include in an agreement or license a provision limiting or providing the methods for the limiting of the total quantity of citrus fruit to be marketed, but certainly this falls far short of authorizing him to fix a minimum price for citrus fruit on the tree.

■ In the first place, the right of a person to sell his property for any price he sees fit to accept is a very valuable right, and should not be taken away except by clear and unmistakable language. It involves the very right to contract. The Legislature did not place such a provision in the Act and the courts should not write it there by implication.

In the second place, the Act provides in effect that the Commissioner is not to place any limitation on the quantity of citrus fruit to be transported in interstate or foreign commerce. The commissioner could be justified in fixing a minimum price only on the theory that it would limit the quantity of citrus fruit to be transported in intrastate commerce and if it would have that effect on intrastate commerce by the same token it would limit the quantity of citrus fruit to be transported in interstate and foreign commerce, a thing which the Act itself says he should not do.

A very similar statute to that of the Texas Citrus Marketing Act was passed upon by the Supreme Court of Washington, in Griffiths v. Robinson, 181 Wash. 438, 43 P.2d 977, 980. What was said by Justice Blake in that case in a concurring opinion is well said and we copy same in full here:

"I concur in the result. To my mind, this case presents entirely different social-economic and legal problems from those presented in the case of Uhden, Inc. v. Greenough [181 Wash. 412, 43 P.2d 983, 98 A.L.R. 1181], referred to in the majority opinion.

"In this case, the director of agriculture has undertaken to set up a milk board to control the milk industry in the Seattle area. He has promulgated an order by which he has undertaken to fix the price at which the producer shall sell his milk, the price the distributor shall pay, and the price at which the distributor shall sell to the consumer. If I grasp the situation, the director, under the most vague legislative authority, has undertaken, in order No. 103, to establish the milk code of the state of New York as the law of this state.

"That the Legislature of this state has the power to enact such a code, I have no doubt. People v. Nebbia, 262 N.Y. 259, 186 N.E. 694; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. That the Legislature, in

chapter 12, Laws 1933 Ex.Sess., has not enacted such a code, I am equally certain.

"The only possible authority to be found in that act to sustain the power the director of agriculture has assumed by the promulgation of order No. 103 is in section 7:

"'Sec. 7. In order to effectuate and carry out the declared policy of this state and the provisions of the Agricultural Adjustment Act of the United States, the director of agriculture of this state is hereby vested and empowered (1) to make rules and regulations with the approval of the Governor and to provide for the regulation and control of production, storage, transportation, sale and distribution of the agricultural commodities or products thereof or competing commodities and products thereof for such time as the present economic emergency exists and (2) to enter into marketing agreements with processors, associations of producers, and other persons engaged in the handling, manufacturing, producing, processing, dealing or sale of agricultural commodities or products thereof in this state. The making of any such agreement shall not be held to be in violation of any provisions of the statutes of this state: Provided, That no such agreement shall be and remain in force after the termination of this act.'

"It is elementary that statutes in derogation of common law shall be strictly construed. The right to sell one's property on the open market is not only a right recognized at common law from time immemorial, but it is a right in property guaranteed by the federal and state Constitutions. So far, the courts have permitted that right to be impinged only when the property involved is used in a business affected with a public interest. People v. Nebbia, supra; Nebbia v. New York, supra. When the individual is denied that right, it must be by legislation so explicit as to leave no doubt as to the legislative purpose.

"Considering the record in the instant case, I am not so much impressed by the argument that there has been an unconstitutional delegation of legislative power to the director of agriculture as I am with the fact that he has attempted to exercise a power which is not authorized by the act at all. If it were held that order No. 103 were authorized by the act, it would mean that the Legislature could abdicate its legislative powers in favor of individuals (the director of agriculture and the Secretary of Agriculture of the United States), and that they, in turn, could delegate the power to other persons.

"I do not deny the power of the Legislature to make such a revolutionary change in our social-economic structure as that wrought by order No. 103. But when the Legislature does exercise that power, it must do so in terms so explicit that he who runs may read."

Neither Section 8 nor 12 contains any language which can be construed as conferring the right of price fixing. We are therefore unable to find any authority in the act authorizing the Commissioner to fix a minimum price on citrus fruit. The Commissioner having acted without authority, his orders were void and the trial court properly enjoined him and his agents from enforcing such orders.

The judgment is affirmed.