[No. 25466. *En Banc.* April 11, 1935.]

AUSTIN E. GRIFFITHS, JR., *et al., Appellants,* v. WALTER J. ROBINSON, *Respondent.*[1]

*Griffiths & Cluck* and *George H. Crandell,* for appellants.

*The Attorney General* and *Geo. G. Hannan, Assistant (E. J. Eagan,* of counsel), for respondent.

*Cheney & Hutcheson, Preston, Thorgrimson & Turner, Allen, Froude & Hilen, H. E. T. Herman,* and *Robert R. Pence, amici curiae.*

HOLCOMB, J.—The 1933 extraordinary session of the legislature enacted chapter 12 [Laws of 1933, Ex. Ses., P. 26], known as the Washington agricultural adjust-

[1]Reported in 43 P. (2d) 977.

ment act. Section 1 sets forth the economic conditions deemed by the legislature to require the enactment:

"That the present acute economic emergency being in part the consequence of a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities and has seriously impaired the agricultural assets supporting the state credit structure, it is hereby declared that these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a public interest, have burdened and obstructed the normal currents of commerce in such commodities, and render imperative the immediate enactment of this act." Rem. 1934 Sup., § 3035-1 [P. C. § 77-11].

Section 2 declares it to be the policy of the legislature:

"(1)  To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the basic period.  The basic period in the case of all agricultural commodities shall be the pre-war period, August, 1909—July, 1914.

"(2)  To approach such equality of purchasing power by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic markets.

"(3)  To protect the consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the pre-war period, August, 1909—July, 1914. It is

hereby declared to be the policy of this state to cooperate with and assist the national government in promoting the rehabilitation of agriculture and in eliminating the causes of the collapse of agricultural purchasing power, and to that end to bring about the formulation of marketing agreements as may be approved by the Secretary of Agriculture of the United States and the enforcement of such agreements within this state between producers and distributors or marketing agencies handling the products of agriculture or subdivisions thereof engaged in transactions in or affecting intrastate commerce therein and those engaged therein in transactions in or affecting interstate or foreign commerce." Rem. 1934 Sup., § 3035-2 [P. C. § 77-12].

Section 4 (Rem. 1934 Sup., § 3035-4 [P. C. § 77-14]) provides that any marketing agreement approved or prescribed by the secretary of agriculture pursuant to the terms of the national agricultural act for such agricultural industry or subdivision thereof, shall be considered as the standard of fair competition in intrastate transactions, and the violation of such standard shall be deemed unfair competition, and shall be unlawful and punishable as a gross misdemeanor.

Section 7 of the act is as follows:

"In order to effectuate and carry out the declared policy of this state and the provisions of the Agricultural Adjustment Act of the United States, the director of agriculture of this state is hereby vested and empowered (1) to make rules and regulations with the approval of the Governor and to provide for the regulation and control of production, storage, transportation, sale and distribution of the agricultural commodities or products thereof or competing commodities and products thereof for such time as the present economic emergency exists and (2) to enter into marketing agreements with processors, associations of producers, and other persons engaged in the handling, manufacturing, producing, processing, dealing or sale of agricultural commodities or products thereof in this

state. The making of any such agreement shall not be held to be in violation of any provisions of the statutes of this state: *Provided,* That no such agreement shall be and remain in force after the termination of this act." Rem. 1934 Sup., § 3035-7 [P. C. § 77-17].

Section 8 (Rem. 1934 Sup., § 3035-8 [P. C. § 77-18]) provides for issuing licenses or permits to processors, manufacturers, associations of producers, and all other persons engaged in intrastate commerce of agricultural commodities, and for the revocation of such licenses, upon notice and hearing, for the violation of its terms and conditions. Under the terms of § 9 (Rem. 1934 Sup., § 3035-9 [P. C. § 77-19]), it is made the duty of the director to issue the licenses or permits provided for to any person handling agricultural commodities, upon application therefor and on the agreement on the part of the applicant that he will comply with the terms and conditions of any marketing agreement approved or prescribed by the United States secretary of agriculture or state director of agriculture. As to the issuing of the licenses, a discretion is reserved in the director to refuse a license to any person who intends engaging in the processing or wholesaling of agricultural products in any place within the state when he shall be satisfied that the market in such territory is amply supplied and that the granting of a license to the person applying therefor, not theretofore engaged in such business within the territory, would unnecessarily tend to increase the cost to the consumer and increase the purchasing price to the producer. In relation to the suspension or cancellation of licenses issued under the act, provision is made for notice and hearing, and an appeal to a board of review consisting of the secretary of state, director of conservation and development, and the director of the extension service of the Washington state college, which board is given

authority to review the actions of the director of agriculture.

Section 12 (Rem. 1934 Sup., § 3035-12 [P. C. § 77-22]), makes it unlawful and punishable as a gross misdemeanor for any person to engage in handling, processing, wholesaling or retailing agricultural produce without obtaining a license, for each day of such violation.

Section 14 (Rem. 1934 Sup., § 3035-14 [P. C. § 77-24]) provides that the director of agriculture, with the consent of the governor, shall prescribe the license fees to be charged in order to defray the expenses of administering the act; that the license fee shall not be less than one dollar nor more than twenty-five dollars per annum for retailers of agricultural produce, nor less than fifty dollars nor more than two hundred and fifty dollars per annum for processors or wholesalers.

Section 15 (Rem. 1934 Sup., § 3035-15 [P. C. § 77-25]) appropriates the sum of fifty thousand dollars for the administration of the act by the director, with the proviso that in no case shall the expenses exceed the receipts from licenses collected.

Section 16 provides:

"As used in this act, the term 'basic agricultural commodity' means wheat, field corn, hogs, beef, poultry, eggs, fruit, and milk and its products, and any regional or market classification, type or grade thereof; but the director of agriculture shall exclude from the operation of the provisions of this act, during any period, any such commodity or classification, type or grade thereof if he finds, upon investigation at any time and after due notice and opportunity for hearing to interested parties, that the conditions of productions, marketing and consumption are such that during such period this act cannot be effectively administered to the end of effectuating the declared policy with respect to such commodity or classification,

type or grade thereof." Rem. 1934 Sup., § 3035-16 [P. C. § 77-26].

Acting under the authority of this act, after holding meetings with producers and distributors, the director, with the approval of the governor, issued certain orders in relation to the production and marketing of milk and its products in the district defined as the Seattle area, and particularly order 103, being the code or marketing agreement in force at the time of the institution of this suit.

Order 103 provides for the organization of a committee of twelve members to be known as the milk industry board, whose purpose is to aid the director in the administration and enforcement of the order.

Certain exhibits defining the boundaries of the Seattle marketing area, adopting a schedule of prices at which fluid milk is to be sold by producers and purchased by distributors for distribution and consumption in the marketing area, a plan for the control of production, schedules governing the prices to be charged by distributors in the marketing area, and a schedule of prohibited trade practices, were adopted.

This order 103 and plan and schedules are unnecessary to set out because of our conclusion as to the validity of the law itself.

Appellant Griffiths is a distributor of milk in the Seattle area, and the other appellants are producers of milk in that area. In a voluminous complaint, they challenge the act and order 103 issued thereunder upon numerous grounds, involving the constitutionality of the act and the right of the director to make the order and the manner of its enforcement. They allege that the act and the order are in contravention and denial of § 3 of Art. I of the state constitution, which provides that "No person shall be deprived of life, liberty or property without due process of

law," and in contravention and denial of § 7 of Art. I, providing that "No person shall be disturbed in his private affairs . . . without authority in law," and in contravention of § 10 of the same article, which provides that "Justice in all cases shall be administered openly." They charge that the act and order are in contravention of § 12 of Art. I, providing that

"No law shall be passed granting to any citizen, . . . or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations;"

and in contravention of Art. XII, § 22, directed against monopolies and trusts. They also complain that the act is an unlawful delegation of legislative authority.

The prayer of the complaint is that the act be declared void, in so far as the court finds it to be unconstitutional, and that the order be held illegal and set aside, in so far as the court finds it to be without authority in law; and, pending a hearing, that the director be enjoined from enforcing the order against plaintiffs, or any of them, and from enforcing or collecting any assessments or charges thereunder in the particulars complained of.

Respondent interposed a demurrer to the complaint based upon statutory grounds, and afterwards filed, in substance, a general denial of the facts alleged in the complaint, and alleged as an affirmative defense that the order complained of was enforced by him in good faith as director, and pursuant to the authority vested in him by the agricultural adjustment act.

After trial to the court, judgment was entered denying the relief prayed for and dismissing the action, from which plaintiffs appeal.

The challenge by appellants to the act and the order

of the director will be decided only on the constitutional power of the legislature under two relevant provisions of our state constitution.

We have just decided in a concurrent case, *Uhden, Inc., v. Greenough, ante* p. 412, 43 P. (2d) 983, that the delegation of power to the Federal secretary of agriculture, the governor, and the state director of agriculture, is invalid, and there is no need to further discuss that matter herein. We also decided in that case that the legislation does not offend against § 22, Article XII, of our state constitution prohibiting monopolies and trusts. In addition to what was there said, we deem it unjustifiable and inexpedient to so bind, limit and restrict the state itself in dealing with such matters by its own laws, and that constitutional provision never so intended.

We are practically unanimous that such a law as that now before us would be an appropriate exercise of the police power of the state in regulating such matters as this law attempts to regulate, and that milk is one of the basic agricultural commodities of the state, affected with a public interest, but not such a basic agricultural commodity as was found, declared to be, and adjudged as, a "paramount, basic commodity" in New York, in *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469.

We have recently been told by that high authority that an emergency does not create power, nor increase granted power, nor diminish restrictions imposed upon power granted or reserved, but that emergency may cause the exercise of power theretofore dormant. *Home Building & Loan Association v. Blaisdell,* 290 U. S. 398, 54 S. Ct. 231, 88 A. L. R. 1481. The more recent decision by that court in *Panama Refining Co. v. Ryan,* 55 S. Ct. 241, fortifies us in our conclusion that, since Congress cannot abdicate or transfer to

others its legislative functions under the Federal constitution, neither can our legislature do the same thing under our constitution, especially by such a nebulous, indefinite grant of power as this act attempts.

See, also, *United States v. Schechter,* 8 Fed. Supp. 136; *Franklin Process Co. v. Hoosac Mills Corporation,* 8 Fed. Supp. 552; *Uhden, Inc. v. Greenough, supra,* and the cases therein cited.

For these reasons, and those set forth in the *Uhden* case, *supra,* the judgment of the trial court is reversed, and remanded with direction to enter judgment conforming hereto.

MILLARD, C. J., BEALS, and MITCHELL, JJ., concur.

TOLMAN, J. (concurring)—For the reasons expressed in my concurrence in the results reached in the case of *Uhden, Inc. v. Greenough, ante* p. 412, 43 P. (2d) 983, I also concur here in the results only.

STEINERT, J. (concurring)—For the reasons assigned in my concurring opinion in the case of *Uhden, Inc. v. Greenough, ante* p. 412, 43 P. (2d) 983, I concur in the reversal of the judgment of the trial court.

BLAKE, J. (concurring)—I concur in the result. To my mind, this case presents entirely different social-economic and legal problems from those presented in the case of *Uhden, Inc. v. Greenough, ante* p. 412, 43 P. (2d) 983, referred to in the majority opinion.

In this case, the director of agriculture has undertaken to set up a milk board to control the milk industry in the Seattle area. He has promulgated an order by which he has undertaken to fix the price at which the producer shall sell his milk, the price the distributor shall pay, and the price at which the distributor shall sell to the consumer. If I grasp the situation,

the director, under the most vague legislative authority, has undertaken in order number 103 to establish the milk code of the state of New York as the law of this state.

That the legislature of this state has the power to enact such a code, I have no doubt. *People v. Nebbia,* 262 N. Y. 259, 186 N. E. 694; *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469. That the legislature, in chapter 12, Laws of 1933, Ex. Ses., p. 26 (Rem. 1934 Sup., § 3035-1 [P. C. § 77-11] *et seq.*), has *not* enacted such a code, I am equally certain.

The only possible authority to be found in that act to sustain the power the director of agriculture has assumed, by the promulgation of order number 103, is in § 7.

"In order to effectuate and carry out the declared policy of this state and the provisions of the Agricultural Adjustment Act of the United States, the director of agriculture of this state is hereby vested and empowered (1) to make rules and regulations with the approval of the Governor and to provide for the regulation and control of production, storage, transportation, sale and distribution of the agricultural commodities or products thereof or competing commodities and products thereof for such time as the present economic emergency exists and (2) to enter into marketing agreements with processors, associations of producers, and other persons engaged in the handling, manufacturing, producing, processing, dealing or sale of agricultural commodities or products thereof in this state. The making of any such agreement shall not be held to be in violation of any provisions of the statutes of this state: Provided, That no such agreement shall be and remain in force after the termination of this act." Rem. 1934 Sup., § 3035-7 [P. C. § 77-17].

It is elementary that statutes in derogation of common law shall be strictly construed. The right to sell one's property on the open market is not only a right

recognized at common law from time immemorial, but it is a right in property guaranteed by the Federal and state constitutions. So far, the courts have permitted that right to be impinged only when the property involved is used in a business affected with a public interest. *People v. Nebbia, supra; Nebbia v. New York, supra.* When the individual is denied that right, it must be by legislation so explicit as to leave no doubt as to the legislative purpose.

Considering the record in the instant case, I am not so much impressed by the argument that there has been an unconstitutional delegation of legislative power to the director of agriculture as I am with the fact that he has attempted to exercise a power which is not authorized by the act at all. If it were held that order number 103 were authorized by the act, it would mean that the legislature could abdicate its legislative power in favor of individuals (the director of agriculture and the secretary of agriculture of the United States), and that they, in turn, could delegate the power to other persons.

I do not deny the power of the legislature to make such a revolutionary change in our social-economic structure as that wrought by order number 103. But when the legislature does exercise that power, it must do so in terms so explicit that he who runs may read.

MAIN, J. (concurring)—I think the judgment in this case should be reversed for the reasons stated by me in my concurring opinion in the case of *Uhden, Inc. v. Greenough, ante* p. 412, 43 P. (2d) 983.

GERAGHTY, J. (dissenting)—In considering the legal problem involved in legislation of this character, we are apt to be biased by traditional modes of thought. Since the organization of independent government in this country, it has been its uniform policy, as it had

been in England from the time of Queen Elizabeth, to condemn and punish as criminal, restraints upon the free traffic in commodities, particularly when these restraints had as their end the increase of prices. All artificial restraints tending to raise prices were considered to be against public policy and inimical to the consuming public. This has been for so long the accepted formula that we are disposed to regard it as the only legitimate justification for governmental intervention in respect to price control.

But the power to bind implies the power to loose. Logically, power adequate at one time to restrain practices deemed inimical to public welfare as tending to increase the level of prices may, at another time, under different conditions, and with another conception of public policy, be exercised in the interest of large groups of producers to raise the level of prices.

And so we have now, in the numerous acts of the character here involved, Federal and state, a reversal of the historic policy with respect to price control and a deliberate attempt by government, through the employment, under its sanction and supervision, of certain restraints and combinations having as their declared purpose the raising of the prices of agricultural products "to a level and a purchasing power on a parity with the things those engaged in agriculture are required to purchase."

Laws of the character here involved are said to be enacted under the police power, which is but another name for the sovereign right of the state to govern men and things. This power is adequate to meet all the needs of organized society. At one time, it may find occasion for its appropriate exercise in laws designed to repress combinations and restraints tending to raise prices; at another, it may find its appropriate

expression in laws and regulations having as their end the raising of price levels; the purpose being in either case to do what at the time is thought best and needful for the common welfare.

"Governmental power must be flexible and adaptive. Exigencies arise, or even conditions less peremptory, which may call for or suggest legislation, and it may be a struggle in judgment to decide whether it must yield to the higher considerations expressed and determined by the provisions of the Constitution. . . . The point where particular interests or principles balance 'cannot be determined by any general formula in advance.'" *Eubank v. Richmond,* 226 U. S. 137, 33 S. Ct. 76, Ann. Cas. 1914B 192, 42 L. R. A. (N. S.) 1123.

The instant case involves the regulation and control of the production and sale of milk, having as its end the raising of prices to a standard fixed in the act. The director, through the regulations adopted for the milk industry, seeks to attain this standard of prices and justifies his regulations by reference to the powers granted in the act. But the act itself is not limited to the milk industry. It applies as well to other basic agricultural products. In so far as this case is concerned, the legislative act, and the regulations of the director with certain exceptions in the matter of detail, could be sustained upon the authority of *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 89 A. L. R. 1469.

But I do not think the court should rest its opinion upon the narrow basis of the paramount importance of the milk industry. In the *Nebbia* case, the court considered the production and distribution of milk as affected with a public interest, but, as the court said, it is clear that there is no closed class or category of businesses affected with a public interest. And so the businesses of supplying bread, meat or other essential foods, if they differ in importance from the business

of supplying milk, do so only in degree, and not in principle. The agricultural adjustment act is not enacted solely in the interest of one agricultural product or one group of producers, but has for its purpose the price stabilization of all the basic products of agriculture coming within its purview.

Reading the act as a whole, having in mind its declared purpose and particular provisions, I am unable to escape the conclusion that the price fixing power is granted. Indeed, without this power the act would prove abortive. Any plan for the control of production and distribution would fail of its purpose if the producers and distributors were left free to engage in destructive competition. This general view of the act is fortified by reference to its particular provisions. Section 2 declares its purpose to be to re-establish prices at a standard there established; and § 7 provides that, in order to effectuate and carry out the declared policy of the state, the director shall be empowered to make rules and regulations governing, among other things, the sale and distribution of agricultural products.

Assuming the act contemplates price fixing, I do not think that, as so construed, it violates the constitution. In discussing price fixing, Judge Roberts, in the *Nebbia* case [p. 529], said:

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld. On the other hand, where the policy of the state dictated that a monopoly should be granted, statutes having that effect have been held inoffensive to the constitu-

tional guarantees. . . . The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago.''

To the objection that the act violates Art. XII, § 22 of the state constitution prohibiting monopolies and trusts, it is sufficient to say that the combinations and restraints authorized by the act are intended to further the declared public policy of the state itself. The combinations and restraints inhibited by the constitution are obviously those private in their nature, having for their purpose the exploitation of the public for private gain. Here, while the director before making his order may consult producers and distributors, the order, when made, becomes the public act of the director, enjoined by the provisions of the statute.

''The monopoly interdicted by the constitution is one whose activities are hostile and oppressive to the common welfare, rather than those which at all times are subject to the dominion, judgment and immediate regulation by the state.'' *State ex rel. Department of Public Works v. Inland Forwarding Corp.*, 164 Wash. 412, 2 P. (2d) 888.

I infer from the opinions of Judge Holcomb in this and the *Uhden* case that he concedes broadly that the legislature possesses the power, if properly exercised, to do what the act contemplates, but that the act is invalid, in that it fixes no standards and attempts to delegate to the director of agriculture undefined powers. It seems to me that this is giving with one hand and taking away with another. If we concede a right

in the legislature itself to do what is necessary to attain the end sought by this act, then it is manifest that some agency must be created to manage the details of any effective plan. The utmost the legislature can do is to declare its purpose and, in broad outline, the ends to be accomplished. The extent to which power may be delegated is dependent upon the circumstances and necessities of the particular situation. This problem was discussed by Chief Justice Taft in *Hampton & Co. v. United States,* 276 U. S. 394 [406], 48 S. Ct. 348, where he said:

"In determining what it [the legislature] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.

"The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the Executive Branch, within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution, even to the extent of providing for penalizing a breach of such regulations."

And in *Interstate Commerce Commission v. Goodrich Transit Co.,* 224 U. S. 194, 32 S. Ct. 436, it is said:

"The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress."

In the *Hampton* case, Judge Taft quoted with approval from the opinion of Judge Mitchell in *State v. Chicago, M. & St. P. Ry. Co.,* 38 Minn. 281, 37 N. W. 782, as follows:

454

" 'If such a power is to be exercised at all, it can only be satisfactorily done by a board or commission, constantly in session, whose time is exclusively given to the subject, and who, after investigation of the facts, can fix rates with reference to the peculiar circumstances of each road, and each particular kind of business, and who can change or modify these rates to suit the ever-varying conditions of traffic. . . . Our legislature has gone a step further than most others, and vested our commission with full power to determine what rates are equal and reasonable in each particular case. Whether this was wise or not is not for us to say; but in doing so we cannot see that they have transcended their constitutional authority. They have not delegated to the commission any authority or discretion as to what the law shall be,—which would not be allowable,—but have merely conferred upon it an authority and discretion, to be exercised in the execution of the law, and under and in pursuance of it, which is entirely permissible. The legislature itself has passed upon the expediency of the law, and what it shall be. The commission is intrusted with no authority or discretion upon these questions.' "

Numerous cases might be cited from our own courts sustaining delegation of power to administrative board and officers. In *Vail v. Seaborg*, 120 Wash. 126, 207 Pac. 15, the court sustained a law vesting in *the state fisheries boards*

" . . . 'the power from time to time to make, adopt, amend and promulgate, in the manner provided by law, rules and regulations governing the possession, disposal and sale of food fishes within the state of Washington, whether taken within or without the state of Washington, fixing the times when the possession, disposal or sale of the several classes of, or all, food fishes is prohibited.' Rem. Comp. Stat., § 5753."

In *Larsen v. Rice*, 100 Wash. 642, 171 Pac. 1037, the court sustained the minimum wage law for women, authorizing the industrial welfare commission to

"  . . . establish such standards of wages and conditions of labor for women and minors employed within the state of Washington, as shall be held hereunder to be reasonable and not detrimental to the health and morals, and which shall be sufficient for the decent maintenance of women." [Rem. Rev. Stat., § 7624½.]

Whether this law is wise or unwise, it is not for us to say. The court is only concerned with the question of power.

Believing that the legislature possesses the power to enact the agricultural adjustment act, and that the administrative functions devolved upon the director are defined by sufficient standards, I am constrained to dissent from the majority, and am of the opinion that the judgment of the lower court should be affirmed.