[No. 25703. *En Banc.* July 23, 1935.]

THE STATE OF WASHINGTON *et al., Appellants,* v. MATSON COMPANY, *Respondent and Cross-appellant.*[1]

[1]Reported in 47 P. (2d) 1003.

508

· *The Attorney General* and *George G. Hannan, Assistant (E. J. Eagan* and *Cheney & Hutcheson,* of counsel), for appellants.

*Rigg, Brown & Halverson* and *Paul M. Goode,* for respondent and cross-appellant.

*Frank E. Holman (Todd, Holman & Sprague* and *Kenneth I. Ghormley,* of counsel), *Allen, Froude & Hilen, Richard S. Munter, H. E. T. Herman, Harroun, Maloy & Shidler, Bayley & Croson, Richards, Conklin & Delle,* and *Crollard & O'Connor, amici curiae.*

HOLCOMB, J.—The state and its director of agriculture brought this suit, setting up two causes of action against the defendant, which was engaged in the purely intrastate activities of warehousing, conditioning and buying and selling fruit.

After disposing of preliminary motions, the issues presented by the complaint were challenged by a demurrer. The trial court sustained the demurrer as to the second cause of action and overruled it as to the first. Each party declined to plead further, and a decree followed, the mandatory provisions of which we quote:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the defendant Matson Company, a corporation, be and it is hereby fully and in all respects restrained and enjoined from engaging in the business of handling, wholesaling and dealing in deciduous tree fruits as defined in the 1935 act and marketing agreement, rules and regulations therein adopted without first fully complying with said act and the marketing agreement, rules and regulations adopted by said act and particularly is enjoined and restrained from transacting any of such business without collecting and paying

in to the director of agriculture the assessments provided for therein.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiffs' second cause of action be and the same is hereby dismissed with prejudice.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the accounting prayed for in plaintiffs' first cause of action shall be had and in the event the defendant does not make such accounting, then in that event the plaintiffs may bring an additional action to secure such an accounting, and this action shall not be considered a bar to any such action."

Plaintiffs appealed from that part of the decree which dismisses the second cause of action, and defendant has cross-appealed from that portion of the decree which grants relief as against it on the first cause of action. For brevity, they will be mentioned herein as appellants and respondents.

The second cause of action is based upon the agricultural adjustment act of 1933, which was held to be unconstitutional by this court in *Uhden v. Greenough*, 181 Wash. 412, 43 P. (2d) 983, and *Griffiths v. Robinson*, 181 Wash. 438, 43 P. (2d) 977, and upon the marketing agreement and the orders promulgated by the director of agriculture thereunder.

The facts are pleaded in great detail, but it is unnecessary to make an extended statement here, further than to say that sufficient is pleaded to present the basic question of the right of the state to now collect from respondent the moneys which it deducted and retained from the growers with whom it dealt before the law was declared unconstitutional, to cover the assessments provided for by the marketing agreement and orders made before the adverse decisions mentioned.

Respondent was licensed as a dealer and agreed to comply with the marketing agreement rules and regu-

lations. It retained and now has in its possession a substantial sum of money which it deducted or retained from what was due from it to the growers, by virtue of the agricultural adjustment act and the marketing agreement, rules and regulations adopted thereunder.

Appellants assert that respondent should deduct that money as the agent of the state, and that the money now belongs to the state and does not belong to the growers from whom it was unlawfully withheld.

Appellants contend that one who acts for the state in collecting a tax may not, when called upon to account, assert the invalidity of the law under which the collection was made; and that, having taken advantage of the act and obtained the money by virtue thereof, he may not unjustly enrich himself by asserting that the law was unconstitutional and void; citing *Spencer v. Consumers' Oil Co.,* 115 Conn. 554, 162 Atl. 23; *Shipe v. Consumers' Service Co.,* 28 Fed. (2d) 53, and other cases along the same line.

In all of these cases, the tax was clearly levied upon the consumer, or upon the product to be consumed, and the dealer was but the agent to collect the tax for the use and benefit of the taxing power. The rule is a sound one when so applied, but here we have no tax for the support of the government, but only an assessment for the benefit of the fruit industry; and moreover, we think upon the face of the orders made by the director of agriculture, upon which the cause of action is based, the assessment in question was levied upon the dealer and no one else.

Article V of order 128 is entitled ''Assessments'' and is the controlling order upon this question. Section (a) of that article provides that all dealers shall be licensed. Sections (b) and (c) read:

"(b) For the purpose of administering this order and for the establishment of a fund for advertising purposes, the Executive Board, with the approval of the Director, shall levy an assessment of such an amount per packed box, or equivalent on fruit packed in other containers or sold loose, as shall be necessary.

"(c) The first dealer who handles or purchases the fruit from the grower or owner shall pay this assessment to the Executive Board in accordance with such regulations, and at such time and place as the Board may designate, and may deduct the amount paid from any monies due the grower or owner, or add such amount to the handling charge, expense, or advances incident to the handling of the fruit; Provided, the grower or original owner shall pay the assessment on all fruit sold by him directly or through a handler outside the state of Washington."

It is unnecessary to construe the language or intendment of these orders made under the 1933 law. They were all made under an unvalid law, and as said in the *Uhden* and *Griffiths* cases, *supra,* were mere unlawful and arbitrary edicts. They, each and all, became *functus officio* with the death of that act. See *Drum v. University Place Water District,* 144 Wash. 585, 258 Pac. 505, and cases cited. That is *stare decisis* here.

The demurrer was properly sustained to the second cause of action, and the judgment dismissing it is affirmed.

The cross-appeal of respondent challenges the judgment entered on the first cause of action.

Chapter 78, Laws of 1935, p. 170, is a new piece of legislation designed, apparently, to supersede and take the place of chapter 12 of the Laws of 1933, Ex. Ses., p. 26, Rem. 1934 Sup., § 3035-1 [P. C. § 77-11] *et seq.* It is more comprehensive than the earlier act, but, speaking generally, it does not

appear to meet the objections that were sustained by the court to the former act in the *Uhden* and *Griffiths* cases, *supra,* but, on the other hand, is a more complete abdication of the legislative power than the 1933 act.

Sections 2 and 7 of the present act, while more elaborate than the like numbered sections of the prior act, are still apparently just as fatally deficient in providing a primary definite standard for the guidance of the director of agriculture in price fixing and market control.

Section 3 of the Laws of 1935, p. 172, is a new section introducing matter which did not appear in the former act. It reads:

"Sec. 3. a. It is hereby further declared to be the policy of the legislature to increase the consumption of Washington grown agricultural products and to that end, and for other purposes set out in this act, the director, with the approval of the governor, may provide, in any marketing agreement covering any agricultural product, or competing commodity, produced or sold within this state, for assessments to be levied upon such products and manner of collecting such assessments. Failure by any person to comply with assessment regulations specified in any marketing agreement shall be construed to be a violation of this act.

"b. Such assessments shall be used (1) to pay the cost and expense of administering and enforcing the marketing agreement; (2) to advertise such Washington agricultural products; (3) to obtain relief from discriminatory freight rates on such agricultural products; (4) to obtain relief from competing agricultural products of foreign countries, by securing reasonable tariffs on such competing products; (5) to secure the passage or promulgation of laws or rules and regulations by the United States Congress, and/or the respective Federal departments and bureaus, providing for the inspection and certification at the point of ship-

ment as to the purity and grade of Washington agricultural products; (6) to carry on, and have carried on, scientific researches to develop further and greater uses of such products as food and therapeutic agencies, and (7) to do such other things as will tend to effectuate the purposes of the respective marketing agreements.

"c. Any such marketing agreements shall provide for committees to administer such marketing agreements, under the order and direction of the director and subject to his supervision and control. The director shall, by order, provide for the election of the grower and producer members of such committees by the growers and producers affected by such agreements, and the election of the wholesaler, processor, retailer and handler members of such committees by the wholesalers, processors, retailers and handlers of such products, in such manner as will insure a fair and impartial election of bona fide members of such industry and who shall fairly represent all branches of the industry affected by the agreements. The consumer members of committees shall be appointed by the governor." [Rem. 1935 Sup., § 3035-3a.]

Section 19 is also new and reads:

"All marketing agreements, rules and regulations heretofore adopted or prescribed by the director, under and by virtue of Chapter 12, Laws of Extraordinary Session 1933-1934, are hereby adopted, constituted and declared to be operative and to remain in force as the rules, marketing agreements and regulations of the director under this act until such time as they or any of them are modified, amended or revoked by the director, as herein provided, and all licenses heretofore issued by the director under said act for the year 1935 shall continue in effect and be construed to be licenses under this act: *Provided, however,* That if any license has been issued to a licensee who conducts his business in more than one location, any license heretofore issued shall apply to only one of such locations: *Provided further,* That nothing in this act

shall be construed as regulating or preventing the practice of ''Welcome Wagon Service' in incorporated cities and towns in the State of Washington.'' [Rem. 1935 Sup., § 3035-19.]

Section 21 contains the usual saving clause to the effect that, if any part of the act be held unconstitutional, the remainder of the act shall not be affected thereby.

The 1935 act cures none of the defects in the 1933 act, but leaves the situation more nebulous and indefinite, because the delegation of power is not only to a state administrative officer, the director, but to the director and a special privileged group of private persons. Section 7 of the 1935 act sets up a tribunal or body in each industry, headed by the director, which, under the provisions of § 19, has the power to amend, modify or revoke what appellants claim has become by adoption or reference the statutory law of the state.

Besides being more nearly an offense against the constitutional prohibition forbidding monopolies, Article XII, § 22, Washington constitution (although that question is not necessary now to determine), it is an unauthorized delegation of legislative power to the officers and persons specified therein.

Such legislative delegation is more pronounced than under the 1933 law. It is governed by the decisions in the *Uhden* and *Griffiths* cases, *supra,* and *Panama Refining Co. v. Ryan,* 293 U. S. 388, 55 S. Ct. 241, cited therein; *Tucson v. Stewart,* 40 P. (2d) (Ariz.) 72; and *Gibson Auto Co. v. Finnegan,* 259 N. W. (Wis.) 420.

In the last cited case, that court said:

''It is difficult to conceive of a more complete abdication of legislative power than is involved in this act. Not only is the power to determine whether or not there shall be a law at all delegated to an indefinite class or group, but the Governor and all other public

officers are rendered powerless to act except upon the initiative of a preponderant majority of a group. It must be borne in mind that the power delegated is not the power to organize and adopt self-governing ordinances. The power delegated is the power to frame and adopt a code which, when approved, becomes a law with penal sanctions.''

That court accordingly held invalid an act patterned after the national industrial recovery act and enacted as an emergency act to promote industrial recovery. The court held that the legislature could not, in effect, abdicate its legislative function, and an act which attempted to do so was invalid in fact, though valid in form.

The same reasoning and principles apply to this act.

The United States supreme court also recently decided in a unanimous decision in *Schechter Poultry Corporation v. United States*, 295 U. S. 495, 55 Sup. Ct. 837, that § 3 of the national industrial recovery act, authorizing the making of codes for the government of trades and industries by or with the approval of the president of the United States, without setting up any standards aside from the statement of the general aim of rehabilitation, correction and development of trades and industries, was an unconstitutional delegation of power to the executive department. It reiterated its previous declaration that extraordinary conditions do not create or enlarge constitutional power and cannot justify governmental action outside the sphere of constitutional authority. The reasoning of that decision is too long to repeat here to any great extent, but is unanswerable.

The 1935 act, in attempting to ''adopt,'' ''constitute,'' or ratify unlawful orders or edicts, made under an invalid statute, did not cure the defects of the 1933 law and also attempts to ratify an unconstitutional delegation of legislative power. See 6 R. C. L. 120.

For the foregoing reasons, the judgment of the trial court as to the first cause of action must be, and is, reversed.

MILLARD, C. J., MITCHELL, MAIN, and STEINERT, JJ., concur.

GERAGHTY, J. (concurring)—I concur in the result of the majority opinion.

I dissented from the majority opinions in *Uhden, Inc., v. Greenough,* 181 Wash. 412, 43 P. (2d) 983, and *Griffiths v. Robinson,* 181 Wash. 438, 43 P. (2d) 977, being of the opinion that chapter 12 of the Laws of 1933, Ex. Ses., p. 26, Rem. 1934 Sup., § 3035-1 [P. C. § 77-11] *et seq.,* in its broad features, was constitutional.

In the *Griffiths* case, the majority having reached the conclusion that the 1933 act was unconstitutional, no occasion arose for a discussion of the marketing agreements made by the director, or of the several types of assessments levied under the agreements. If the occasion had called for it, I should have expressed the opinion that the expenses of all of the operations authorized to be carried on under the act were to be paid out of the fund appropriated by the legislature, to be supplied by the license fees; and that, in levying various types of assessments for defraying the expenses of the activities of the several groups, the director was acting arbitrarily and without warrant under the law. The assessments covered by the second cause of action in this case are of this character, and I am of the opinion that the trial court correctly held against the state's right to recover them.

In the act of 1935, the legislature, in the effort to avoid the objection of indefiniteness and absence of standard urged against the 1933 act, has gone to the other extreme by incorporating provisions which, in

my opinion, render the act unconstitutional. The act provides in § 7 that no marketing agreement shall be approved, prescribed, or revoked by the director, except upon the petition of a majority of the producers controlling not less than sixty-five per cent of the products by volume and fifty-one per cent of the producers by number affected by the marketing agreement. In other words, the act delegates, not to responsible officers of government, as was done in the 1933 act, large and discretionary powers, but delegates these powers to irresponsible private groups, and makes irrevocable without their consent any change in agreements, which are given the force and effect of law.

I could see a constitutional justification for the powers delegated to the director in the 1933 law; I see no justification for the delegation of these powers to private groups, as is done in the 1935 law. I am of the opinion that the latter law is unconstitutional.

Tolman, J. (dissenting)—I concur in the result reached by the majority upon the question first discussed, principally, however, upon the ground that the act of 1933 gives no authority to any one to levy or collect assessments of any sort or kind; and in addition to withholding such authority, the act of 1933, by the language used in § 15, by necessary implication forbids the levying of assessments. This question, however, is of but small moment.

The second question involving the first cause of action is important, perhaps vital, to the interests affected, and I shall devote what I have to say entirely to that subject. The majority has kindly quoted § 3 of the act of 1935, and has then proceeded to ignore it entirely. In my judgment, the issues involved in this cause of action turn entirely on § 3 and are in no wise

affected by any of the other provisions of the act of 1935.

It is to be borne in mind that this is an action seeking to enjoin a dealer in fruits from continuing to do business as such without collecting and paying the assessments clearly provided for in § 3. Therefore, no other question is or can be involved, and we have no least shadow of excuse for construing or passing upon any other feature of the 1935 act. Sections 2 and 7 of the 1935 act, which cover the field attempted to be covered by the same numbered sections of the act of 1933, are as foreign to the issues of this case as is the rule against perpetuities or the rule in Shelley's case.

There is raised here no question of price fixing, of market control, or of the control of production and distribution. The whole subject now before us begins and ends in subdivisions (a) and (b) of § 3 of the 1935 act, the clear provisions of which must be kept in mind at all times. Those provisions in plain language declare the legislative intent to establish a public policy looking toward the increase of consumption of Washington grown agricultural products and the levying and collecting of assessments upon such products to provide the means of attaining the end sought. Subdivision (b) of § 3 specifically designates the several ways in which the funds so raised shall be expended.

The only delegation of power relating to this subject is that power given to the director of agriculture to fix the amount and prescribe the manner of collecting assessments. This is no more than the power which is always given to some board, body, or tribunal to ascertain benefits and fix assessments under laws relating to local improvements such as irrigation districts, diking and drainage districts, and the like. This subject partakes strongly of the nature of a special assessment. Agriculture is to be benefited, and the cost is

to be borne by those who receive the benefit. No reason is suggested and none is perceived why the assessments are not sustainable upon the same theory as are all other special assessments.

When we consider the careful manner in which the legislature has limited and defined the several methods to be followed in carrying out its declared purpose, it becomes evident that nothing whatever has been delegated except the mere details. Specifically, the legislature has named the methods which are to be followed, and these methods clearly defined in the act are: (1) to pay the cost of administration; (2) to advertise such agricultural products; (3) to obtain just transportation charges; (4) to obtain relief or protection from competing foreign products; (5) to obtain proper inspection; (6) to conduct scientific research for the purpose of developing further and greater uses of such products; and (7) to do anything else which will advance the interests of the producers of such products. The last subhead is, of course, a catch-all, and under it, it is possible that illegal things might be attempted, but we cannot now presume anything of that kind.

It is therefore clear that many of these methods, if not all of them, are entirely legitimate, practical, and such as will have a tendency to promote and carry out the declared public policy of increasing the consumption of Washington grown agricultural products. No one of these methods has any apparent tendency to create such a monopoly as is forbidden by our constitution or any monopoly; and so long as any one of these methods is legitimate and proper, the levying of assessments to pay for the use of such method and to promote the underlying principle is also proper.

Nothing at all comparable to § 3 appears in the 1933 act. No authority was given by that act to any one to assess anybody or anything for any purpose, and as

we have already said, § 15 of that act, when read in its entirety, by direct and necessary implication forbids any such assessment. Therefore, seemingly beyond a possibility of doubt, the present question was not involved in either *Uhden v. Greenough,* 181 Wash. 412, 43 P. (2d) 983, or *Griffiths v. Robinson,* 181 Wash. 438, 43 P. (2d) 977, and nothing decided in either of those cases has any possible bearing here.

The legislature has, by § 3 of the act of 1935, declared a valid public policy. Whether a wise one or not does not concern us. It has defined with care the methods by which that public policy shall be advanced and carried out; and as the legislature at the time of the enactment could not know with exactness the cost of carrying out the prescribed methods, it very properly delegated the fixing of amounts and the manner of collecting the necessary assessments to be levied upon the product to be benefited.

It is quite apparent that the legislature cannot now know the size or value of a crop still to be grown, the exact amount which will necessarily be expended for the purposes designated, or the percentage of that amount which should be borne by each box, package or other unit of a particular product which may reach the market in each several year. Hence, the amount of the assessment and the method of collecting are properly left to the administrative officers.

The provisions of § 3 are therefore sustainable without any reference to § 19 of the 1935 act, but in addition § 19 of the act, also quoted by the majority, refers to the then present rules which were on file and in operation at the time the act was passed (and therefore are exactly identified), which rules are expressly adopted and made effective until changed. These rules, therefore, whether valid under the act of 1933 or not, are by reference expressly made a part of the act of

1935, and therefore by § 19 all question of improper delegation of powers is put at rest.

I think the purpose is as definitely stated in § 3 as its nature will permit; that the means for accomplishing that purpose are clearly defined; and that such powers as are delegated are administrative powers only. Not only so, but § 11(b) of the act of 1935 provides for a judicial review of any and all rules, thus affording ample protection from arbitrary action.

The promotion of the interests of agriculture by the seven methods mentioned in § 3 is a subject clearly severable from all of the other features of the act. As before stated, it had nothing to do with price fixing, market control, or the control of production; and under the provisions of the saving clause contained in § 21 to the effect that, if any part of the act be held unconstitutional, the remainder shall not be affected thereby, it is clearly our duty to pass upon the single question before us and to uphold the provisions of § 3, notwithstanding we may be convinced that other provisions of the act not now in issue may be unconstitutional.

I am thoroughly convinced that the features of the act which are here questioned are well within the rule announced by this court in *Vail v. Seaborg,* 120 Wash. 126, 207 Pac. 15, and since we are dealing with a question which is important to this state and its people, and one which affects none other, we need not look elsewhere for authority.

I have examined with care the many authorities cited, and find none which to me seems to be contrary to the views I have attempted to express.

The judgment on the first cause of action should be affirmed, and I therefore dissent both from the views expressed and the results reached by the majority.

BEALS and BLAKE, JJ., concur with TOLMAN, J.